# United States Court of Appeals

### For the Eighth Circuit

_____

No. 13-1206

_____

Joan Roe

*Plaintiff - Appellant*

Mary Roe; John Roe

*Plaintiff*s

v.

St. Louis University

*Defendant - Appellee*

Sigma Tau Gamma Epsilon Xi Chapter; Sigma Tau Gamma Fraternity, Inc.

*Defendant*s

------------------------------

National Women's Law Center

*Amicus on Behalf of Appellant*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: January 16, 2014
Filed: March 25, 2014

_____

Before LOKEN, MURPHY, and COLLOTON, Circuit Judges.

_____

MURPHY, Circuit Judge.

Joan Roe[1], a student athlete recruited for the field hockey team at Saint Louis University, and her parents brought this case under Title IX, a federal statute banning discrimination on the basis of sex in federally funded educational programs, and Missouri state law. Roe claims deliberate indifference by the University to her rape by another student and state law violations including breach of contract, misrepresentation, and negligence following a back injury she received in training.[2] The district court[3] granted summary judgment to the University, and Roe appeals. We affirm.

I.

In reviewing a summary judgment, we take all facts in the light most favorable to the nonmovant who in this case is Joan Roe. Argenyi v. Creighton Univ., 703 F.3d 441, 446 (8th Cir. 2013). Roe arrived at Saint Louis University to begin her freshman year of college in August 2006. She had played as a goal keeper on her high school

_____

[1] Joan Roe is a name adopted by the plaintiff for use in this litigation.

[2] Roe also sued Sigma Tau Gamma fraternity and its local chapter but subsequently settled with them. The National Women's Law Center appears as amicus curiae in support of Roe.

[3] The Honorable Henry E. Autrey, United States District Judge for the Eastern District of Missouri.

field hockey team and was recruited by the University's intercollegiate team and received a partial scholarship. Roe has stated that she chose to attend Saint Louis University based on her favorable impressions of its athletic programs, educational opportunities, and positive environment.

Roe arrived in St. Louis in August 2006 for preseason training. She began as a second line goal keeper but hoped to move up to starter. After the season began, she injured her back, an injury she first noticed after a hockey practice in late September. Her injury was aggravated by subsequent practices and particularly by a weightlifting trial on October 26. Dr. D. Thomas Rogers, a physician who treated her after she left the University, testified by deposition that the weightlifting trial had further herniated a disc in Roe's low back.

Near the end of October Roe received disappointing midterm grades: 1 C-, 1 D, and 3 Fs. Roe's academic advisor, Peggy Dotson, believed that her low grades were partly due to the demanding field hockey schedule. Roe also experienced other difficulties. Earlier in October she had been accused of plagiarizing a speech in one of her courses. The Athletic Department's academic services coordinator, Mary Clark, contacted Roe about her midterm grades and suggested university resources which could help her improve. These potential resources included a tutor, contacts with her professors, and study arrangements. Roe met with Clark who assisted her in finding a tutor for a geography class. The Athletic Department also arranged for weekly meetings with Roe, a weekly task list from Clark, structured study hall time, and random checks on her class attendance. Meanwhile, Mary Roe had become concerned about her daughter and contacted academic advisor Peggy Dotson who provided her with names and contact information for Joan's professors.

Because of her low grades, Roe was not permitted to travel with the field hockey team to a game in Virginia the weekend of October 26. That same weekend, Roe attended a Halloween costume party on Friday, October 27 at an off campus

apartment building. Three students lived in the apartment, two of whom were members of the Sigma Tau Gamma fraternity's Epilson Xi chapter. The party was not an official fraternity event, however, and was attended by other students. One guest later estimated that almost one hundred people were there while another thought there were up to two hundred.

Roe says she was raped during the Halloween party in a stairwell near the entrance to the hosts' apartment. While she is unable to remember all that happened, she later told the St. Louis police that she had been socializing with a male student whom she identified by name. He was a fraternity pledge who had been dressed in a blue Smurf costume on the night of the party. Other party attendees told the police they had seen Roe and that student dancing together; one witness described seeing them kissing in the stairwell. Both Roe and the male student admitted to drinking alcohol that night. Roe stated that she had started drinking earlier in the evening while watching a baseball game with friends in the dormitory and continued to drink at the party. The male student told the police that Roe invited him to her room while they were dancing; they then left the party and went into the nearby stairwell and began "making out." After sexual intercourse, he asked Roe if she wanted to return to the party, but she declined and he rejoined it alone.

Roe later told the police that she did not remember leaving the party. Her next memory was waking up at a friend's apartment. The friend told the police that she had seen Roe crying at the party, and Roe had explained that she had been sexually assaulted. The friend took Roe back to her apartment with the assistance of other students, and she saw blue makeup stains on Roe's clothes. Roe later told the police that her back and vagina were sore the day after the party.

Shortly after the night of the party, Roe heard that the male student with whom she had been dancing was "bragging" about "having sex with a girl in the stairwell." On October 31 Roe sent him a Facebook message describing the Smurf costume he

-4-

had worn at the party. She wanted him to be aware that she knew he was the costumed man who had raped her. In his statement to the police he claimed that he had communicated with Roe online before and after the evening of the party, all of which Roe denies.

Several days after the party Roe told one of the field hockey captains about the party and said that she had gone into a stairwell with a man dressed as a Smurf. While Roe did not remember exactly what had occurred then, she was sore afterwards. The field hockey captain was concerned and believes she advised Roe to tell their coach about the assault. She also asked "if [Roe had] contacted the police or something like that" and whether she could share her information with the other captain "so that she could help me give better advice." On November 1, the other field hockey captain reported Roe's rape to Janet Oberle, the University's assistant athletic director for NCAA (National Collegiate Athletic Association) compliance and student services.

Oberle became actively involved in trying to help Roe. She called Roe in for a meeting on November 1, the same day she heard about the rape. Before the meeting Oberle spoke with a University professor connected with athletics to seek his advice on how to communicate with Roe. During their meeting Roe told Oberle that she could not remember what had happened and she never told anyone who had assaulted her until after she left the University. Oberle advised Roe that she could contact the University's Department of Public Safety as well as the Office of Judicial Affairs which was responsible for student conduct. Oberle also told Public Safety that a student might be filing a report, but she did not contact Judicial Affairs since Roe had not told her that the man in question was a student. Oberle advised Roe to inform her parents about the rape, but Roe said she did not want Oberle to contact them. Oberle also asked Mary Clark, the academic coordinator in the Athletic Department, to

contact Roe's parents about her grades. On November 2 Roe was suspended from the field hockey team due to her poor grades.

Janet Oberle, the assistant athletic director for NCAA compliance and student services, also referred Roe to Claudia Charles, the counselor for sexual assault at Student Health and Counseling Services. Roe met with Charles on November 3 and told her that she did not want to inform her parents about the rape but that she had received medical treatment after it. Roe later testified in her deposition, however, that she had not sought any such medical care while she was in St. Louis. Oberle also made her own contact with Charles to discuss how the University could support Roe, and on November 6 she spoke to Roe's parents about academic support for their daughter.

Roe's field hockey coach, Marcie Boyer, went to one of Roe's classes on November 15 to check her attendance. Although Boyer did not see her there, Roe later claimed she had been present. The professor teaching the class confirmed however that Roe had not been there. Roe has since admitted that she lied about her attendance. Due to this incident and to her unimproved academic performance, Roe was dismissed from the field hockey team. On December 15 Roe requested a medically based withdrawal from the University. The request was granted, and Roe left St. Louis and never returned to the University.

According to Roe, she did not tell her parents about the rape until after she returned home to Hawaii. On December 18 Roe told her mother that she had been raped but that she did not know the rapist's name. Her father John Roe contacted the University's Department of Public Safety and the St. Louis Police Department on December 19 to report his daughter's rape, and both began investigations. Joan Roe gave the name of the man who had raped her to the police on January 5, and her father contacted the University on January 9 with his name. John Roe also contacted

a student conduct officer at the University about its adjudicative process. That office sent an incident report and hearing guidelines, but neither Roe nor her parents ever filed such a report. After being contacted by the police, the accused rapist spoke to a police detective and claimed that he had had consensual sexual intercourse with Joan Roe. No criminal charges were ever filed.

In September 2008 Roe and her parents filed this federal case against the University and unidentified defendants; an amended complaint followed in April 2009. The Roes sued the University under Title IX for deliberate indifference and disparate treatment, alleging that it had been deliberately indifferent to Joan's rape and that it was liable under a theory of disparate treatment because male athletes with health issues received better care than their female counterparts. Roe further alleged intentional misrepresentation, false promise, negligent misrepresentation, deceptive merchandising practices, and breach of contract. Roe also brought negligence claims against the University, the national fraternity, and its local chapter. Her parents were voluntarily dismissed as plaintiffs in May 2009, the month Roe turned 21.

The case was originally assigned to Judge Jean C. Hamilton who recused herself after Roe raised questions about a former law clerk who had represented the University. The case was reassigned to Judge Henry E. Autrey who denied Roe's motion for his recusal. After the University moved for summary judgment in April 2012, Roe filed a Rule 56(d) motion to extend discovery. In June 2012 Roe then submitted a "Statement and Compendium of Material Facts and Exhibits." She subsequently filed two motions for partial summary judgment, one dealing with her Title IX claims and the other with her back injury claims. On December 12, 2012 the district court denied Roe's motion to utilize a factual compendium she had created to support her motions and directed her to refile individual facts and exhibits in support of her motions as the local rules required. Roe did so and also moved for sanctions against the University for its alleged failure to produce three documents. On

December 31, 2012, the district court denied Roe's 56(d) motion and granted summary judgment for the University, having previously granted summary judgment to the fraternity and its local chapter.

On her appeal Roe argues that the district court erred in granting summary judgment on her deliberate indifference claims under Title IX and on her claims for negligence, breach of contract, and misrepresentation related to her back injury. She also argues that the district court violated her due process rights and abused its discretion by declining to recuse and by denying her Rule 56(d) motion. The University responds that the district court neither erred procedurally nor substantively and that it appropriately applied the relevant court rules.

## II.

Our review of a summary judgment is de novo and the record is examined "in the light most favorable to the nonmoving party." Shrum ex rel. Kelly v. Kluck, 249 F.3d 773, 777 (8th Cir. 2001). We may affirm only if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). After the University submitted its statement of facts in support of its motion for summary judgment, Roe raised no objections to it under Local Rule 7 - 4.01(E) of the Eastern District of Missouri. That rule specifies that any memorandum opposing summary judgment must refer specifically to the "paragraph number from movant's listing of facts" with which it disagrees. The movant's facts will be admitted "unless specifically controverted." If no objections have been raised in the manner required by the local rules, a district court will not abuse its discretion by admitting the movant's facts. Libel v. Adventure Lands of Am., Inc., 482 F.3d 1028, 1033 (8th Cir. 2007). Roe's only response to the University's motion for summary judgment was her subsequent Rule 56(d) motion to extend the opportunity for discovery; she raised no challenges to the University's statement of facts.

## A.

Roe claims that Saint Louis University was deliberately indifferent to her rape in violation of Title IX, 20 U.S.C. § 1681(a), and makes the following Title IX claims: after the University learned about her rape, it failed to inform its Title IX coordinator, her professors, or her parents about it; failed to provide subsequent academic assistance to her; and failed to begin a prompt investigation. She claims the University also exposed her to harassment and took adverse actions after the rape such as suspending her from the field hockey team and later terminating her. Roe further claims that the University exhibited a pattern of deliberate indifference to sexual assault, arguing that its sexual assault policy was inadequate and that it underreported sexual assaults.

In Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq., Congress took action against discrimination on the basis of sex in any educational program that receives federal funding. The statute provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Individuals whose Title IX rights have been violated have a private right of action. Cannon v. Univ. of Chicago, 441 U.S. 677, 717 (1979). The Supreme Court has made it clear that sexual harassment is included within the meaning of "discrimination" under Title IX. Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 281–82 (1998); see also Franklin v. Gwinnett Cnty. Pub. Sch., 503 U.S. 60, 75 (1992).

The Supreme Court explained in Gebser, 524 U.S. at 290, that Title IX damage actions which do not involve an institution's official policy require a showing that "an official who at a minimum has authority to address the alleged discrimination and to

-9-

institute corrective measures on the recipient's behalf [had] actual knowledge of discrimination in the recipient's programs and fail[ed] adequately to respond." According to the Court, this failure to respond or deliberate indifference standard is in "rough parallel" to the Title IX administrative enforcement scheme, which is based on "an official decision by the recipient not to remedy the violation." Id.; see also 20 U.S.C. § 1682 (Title IX administrative enforcement). The Court saw "[c]omparable considerations" under Title IX to those underlying the deliberate indifference standard under § 1983. Gebser, 524 U.S. at 291 (citing Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 410 (1997) (deliberate indifference standard described as "stringent" and "requiring proof that [the official] disregarded a known or obvious consequence of his action")).

Educational institutions may be liable for deliberate indifference to known acts of harassment by one student against another. Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 643 (1999). To be actionable an institution's deliberate indifference must either have caused the harassment or made students vulnerable to it. Id. at 644–45. A plaintiff must show that the institution had "substantial control over both the harasser and the context in which the known harassment occurs." Id. at 645. In order to avoid deliberate indifference liability an institution "must merely respond to known peer harassment in a manner that is not clearly unreasonable." Id. at 648–49. The "not clearly unreasonable" standard is intended to afford flexibility to school administrators. Id. at 648. The Court concluded in Davis that the plaintiff had presented a genuine issue of material fact on the issue of deliberate indifference by the allegation that the school board had "fail[ed] to respond in any way over a period of five months" to complaints by her and other female students. Id. at 649.

Our court has previously considered deliberate indifference claims against a university based on sexual assault allegations in Ostrander v. Duggan, 341 F.3d 745

(8th Cir. 2003). In that case, three University of Missouri students brought sexual assault complaints against fraternity members to the university's Office of Greek Life. Id. at 748. Administrators met with the fraternity's local advisor and wrote to its national president stating the university's expectation that the chapter would investigate the allegations and provide educational programming about sexual assault to its members. Id. Applying the framework developed by the Supreme Court in Davis, 526 U.S. 629, and Gebser, 524 U.S. 274, we held that in order to prove Title IX liability under a deliberate indifference standard, a plaintiff must show that the university was "(1) deliberately indifferent (2) to known acts of discrimination (3) which occur[red] under its control." Ostrander, 341 F.3d at 750 (internal quotation marks omitted) (citing Shrum, 249 F.3d at 782). Even if the university had controlled the location where the assault occurred in Ostrander, there was insufficient evidence of actual knowledge or deliberate indifference on the part of the school. Id. at 751.

Saint Louis University asserts that it was not deliberately indifferent to Roe and her misfortune. Oberle, the university administrator for NCAA compliance and student services, set up a meeting with Roe as soon as she learned that the student athlete had been sexually assaulted. She informed Roe about how to make a complaint and referred her to Claudia Charles, the counselor designated to deal with sexual assaults. Oberle also informed the Department of Public Safety that a student might be filing a complaint and told Charles in advance that Roe would contact her. Oberle also later conferred with Charles about how the University could support Roe. Despite being informed of resources available to help her, Roe declined to report her rape or her assailant and told both Oberle and Charles she did not want the university to inform her parents about it. When Roe's father reported the assault on his daughter to Public Safety after she returned home to Hawaii, the university opened an investigation into it and cooperated with the St. Louis Police Department. The university denies Roe's allegations that it had an inadequate sexual assault policy and that it underreported sexual assaults.

University administrator Oberle arranged a meeting with Roe on the same day she heard about the sexual assault. Roe told Oberle that she did not remember what had happened and she did not identify the man with whom she had been involved. Oberle explained the process for reporting a rape, referred her to counseling, and also informed Public Safety that a student might be filing a sexual assault report. Oberle later contacted Roe's counselor to discuss the need to support the young woman. While Roe alleges that one of the field hockey captains had described to Oberle the costume worn by the rapist, Roe never revealed his identity to anyone at the University until after she left. Nor did she make a report to Public Safety or to Judicial Affairs while she was there. After Roe informed her parents about the rape on her return home in December, John Roe reported it to Public Safety. The university then began an investigation into the assault and cooperated with the separate investigation of the St. Louis Police Department. We conclude that the University's response to the information it had at the time in question has not been shown to exhibit deliberate indifference.

Roe overlooks her expressed desire for confidentiality while she was still on campus. The University argues that it respected her wishes by not informing her parents or professors about the sexual assault and notes the support Dotson and Clark furnished in academic advice and in finding a tutor. While Roe makes general statements about the University's lack of support, there is no evidence that her dismissal from the field hockey team was connected with the rape given her low grades and her untruthful statements about her class attendance. We conclude that the record does not contain evidence to show that the University was deliberately indifferent to student rape or to the sexual assault Roe experienced.

Roe argues that the University's failure to involve its Title IX coordinator after her rape shows its deliberate indifference to her situation. The implementing regulations require recipients of federal funding to designate a Title IX coordinator.

34 C.F.R. § 106.8(a), but the Supreme Court has cautioned that "alleged failure to comply with the [Title IX] regulations" does not establish actual notice and deliberate indifference and it has never held that "the implied private right of action under Title IX allows recovery in damages for violation of [such] administrative requirements," Gebser, 524 U.S. at 291–92; see also Sanches v. Carollton-Farmers Branch Indep. Sch. Dist., 647 F.3d 156, 169–70 (5th Cir. 2011). In this case Roe has not explained what actions the coordinator should have been expected to take if she had made a complaint to that office or if it had been otherwise notified. On this record the noninvolvement of the Title IX coordinator has not been shown to be evidence of deliberate indifference.

Roe also argues that the district court erred by concluding that she had not shown that the rape occurred in a situation under the University's control. The district court reached that conclusion since the rape occurred during a private party in an off campus apartment. Roe argues that the University has control over its students and fraternities; she further alleges that she was potentially exposed to subsequent contact with her rapist and was harassed by the Athletic Department and other students following the rape. The National Women's Law Center argues that the University had disciplinary control over the rapist because he was a student and that universities may control certain off campus behavior due to the nature of the relationship between students and the institution.

The Supreme Court has made it clear, however, that to be liable for deliberate indifference under Title IX, a University must have had control over the situation in which the harassment or rape occurs. Davis, 526 U.S. at 645; see also Ostrander, 341 F.3d at 750. On the facts of this case there was no evidence that the University had control over the student conduct at the off campus party. Nevertheless, this case illustrates why it would be beneficial for colleges and universities to help protect the

-13-

safety of their students by developing educational programs about sexual assault and its consequences, whether or not the offensive acts occur on or off the campus.

We conclude that on this record Roe has not demonstrated a genuine issue of material fact as to whether Saint Louis University acted with deliberate indifference in respect to her rape and its aftermath. Although her sexual assault was clearly devastating to her, Roe has not shown that the University violated Title IX in its response to it or otherwise.

B.

Roe also appeals the district court's grant of summary judgment on her state law claims for negligence, misrepresentation, and breach of contract. Although she did not comply with the local rules by submitting any evidence on these claims in response to the University's summary judgment motion, Roe continues to assert them in relation to the back injury she suffered in field hockey practice which she claims was further aggravated by a weightlifting trial.

Roe first argues that the University was negligent in its treatment and supervision following her injury. Athletic Department personnel did not follow the orders of her physician, she asserts, because she was used in practices and required to participate in a "max weightlifting test" on October 26, 2006. The University first responds that Roe knowingly released any negligence claims when she signed a "Sports Medicine Authorization and Acknowledgement [sic] of Risk" form in August 2006. Roe points out that the section heading for the relevant paragraph was "Acknowledgement [sic] and Waiver for Soccer." Since the sport Roe was to play at the University was field hockey, she argues that the authorization was ambiguous and the release was not valid. To release a party from its own future negligence requires

"clear, unambiguous, unmistakable, and conspicuous language." Alack v. Vic Tanny Int'l of Mo., Inc., 923 S.W.2d 330, 337 (Mo. 1996) (en banc).

The University argues that Roe has not shown causation or breach of any duty to conform to a standard of care. While Roe's physician testified in his deposition that allowing someone with a back injury to lift weights was below the standard of care, he admitted that he is not an athletic trainer and lacked expertise in the area. A standard of care is an objective standard of what is accepted generally in a profession, Hickman v. Branson Ear, Nose & Throat, Inc., 256 S.W.3d 120, 124 (Mo. 2008) (en banc), and experts from other professions are not usually qualified to testify as to it, Brennan v. St. Louis Zoological Park, 882 S.W.2d 271, 273 (Mo. Ct. App. 1994). We conclude that Roe has not created a genuine issue of material fact because she has not presented evidence to show the University breached a duty to conform to a standard of care.

Roe also raises misrepresentation claims. Her amended complaint alleged that the University falsely represented that its athletic program was "state of the art, with proper supervision, using safe, practical exercises, techniques, and equipment" and that she would receive health care at "state of the art" health care facilities "with proper medical care and supervision" and access to "top specialists." Roe asserts that the athletic program staff and medical personnel were less experienced than promised, and that she was not provided promised academic support such as tutoring.

The University argues that Roe's misrepresentation claims would require an analysis of the quality of educational services and are thus barred by the "educational malpractice" doctrine. See Dallas Airmotive, Inc. v. FlightSafety Int'l, Inc., 277 S.W. 3d 696, 699–700 (Mo. Ct. App. 2008) (educational malpractice claims not cognizable in Missouri "because there is no duty"). The University argues in the alternative that Roe has provided no evidence that the University failed to provide promised services

and that Roe has not identified who made any misrepresentations or when and how they were made. Nor did she provide evidence of falsity, reliance, or materiality. Under Missouri law both intentional and negligent misrepresentation require proof of the element of falsity. Colgan v. Washington Realty Co., 879 S.W. 2d 686, 689 (Mo. Ct. App. 1994). We conclude that the district court properly granted summary judgment on Roe's misrepresentation claims because she provided no evidence that any representations made to her were actually false.

Roe also brought a breach of contract claim against the University, based in part on her signed National Letter of Intent, which stated that she had decided to enroll there and that her sport was women's field hockey, and her signed copy of the team rules. Roe's amended complaint alleged that "SLU failed to provide the academic, athletic, and holistic environment agreed to" and failed "to abide by the terms of the contract signed August 11, 2006 dictating that the most serious punishment for first-offenses was suspension from the team." She also asserts that the University was contractually obligated to pay for her medical costs related to field hockey (referencing the field hockey "media guide"), including her medical care after she left the University, and that it admitted this by paying some of these expenses.

The elements of breach of contract in Missouri are (1) a contract, (2) the parties had rights and obligations under the contract, (3) breach, and (4) damages. Kieffer v. Icaza, 376 S.W.3d 653, 657 (Mo. 2012) (en banc). Roe has not demonstrated a genuine issue of material fact on breach. She has not provided evidence that the University failed to provide an agreed upon environment or failed to abide by the field hockey rules. Moreover, Roe's lie about her class attendance was not her first breach of the rules, for she had previously been suspended for poor grades. Nor has Roe shown that the University breached any contractual provision requiring it to pay her medical expenses after leaving the University.

C.

Roe also appeals Judge Autrey's denial of her motion for his recusal. She alleges that he is an alumnus of Saint Louis University and its law school, has taught classes there, and has made positive comments about the school. She also asserts that Judge Autrey has common staff members with Judge Hamilton. We review recusal decisions for abuse of discretion. United States v. Denton, 434 F.3d 1104, 1111 (8th Cir. 2006). Judges are "presumed to be impartial," and a party seeking recusal of a judge must bear the "substantial burden of proving otherwise." Id. (internal quotation marks omitted) (citing Fletcher v. Conoco Pipe Line Co., 323 F.3d 661, 664 (8th Cir. 2003)). Alumni connections are not a reasonable basis for questioning a judge's impartiality, even if alumni contribute financially or participate in educational activities. Lunde v. Helms, 29 F.3d 367, 370–71 (8th Cir. 1994). We conclude that Roe has not shown that Judge Autrey abused his discretion by declining to recuse.

Roe further argues that the district court violated her due process rights by not considering her factual compendium which did not comport with the local rules, by denying her Rule 56(d) motion, terminating the case without a hearing, and by failing to adjudicate her motions for partial summary judgment and sanctions. While litigants have due process rights in pursuing their claims, Logan v. Zimmerman Brush Co., 455 U.S. 422, 429 (1982), we review their claims de novo, United States v. Bennett, 561 F.3d 799, 801 (8th Cir. 2009) (citing United States v. Ray, 530 F.3d 666, 667 (8th Cir. 2008)).

Roe argues that the court violated her due process rights by not considering her submitted facts, but she fails to acknowledge the local rule with which she did not comply. The district court denied her motion related to her own "compendium" of facts, ordering her to resubmit her filings as facts or exhibits in support of her

-17-

motions for partial summary judgment as required by Eastern District of Missouri Local Rule 7 - 4.01(E). Roe never followed the court's required procedure for challenging the University's facts and her only response to its summary judgment motion was to move to extend discovery. Roe argues that the court denied her due process rights by not adjudicating her motions for partial summary judgment and for spoliation sanctions, but she failed to present her positions as required by the court rules for the orderly disposition of issues. Roe filed her partial summary judgment motions over three months after the University's summary judgment motion and moved for spoliation sanctions over eight months later (only four days before the district court issued its memorandum opinion and order granting summary judgment). We conclude that she has not shown error or abuse by the district court or violation of her due process rights.

Roe further argues that the district court abused its discretion when it denied her motion to extend discovery under Rule 56(d). A party seeking a continuance must file an affidavit "showing what specific facts further discovery might uncover." Roark v. City of Hazen, Ark., 189 F.3d 758, 762 (8th Cir. 1999). The district court ruled that Roe did not "present any new, significant reasons" as to why the extension motion should be granted, noting the lengthy discovery period from January 2009 through March 2010, the fact that the discovery deadline had been extended four times, and that Roe had failed to show additional discovery was necessary. See Elnashar v. Speedway SuperAmerica, LLC, 484 F.3d 1046, 1054 (8th Cir. 2007). We conclude that the district court did not abuse its discretion in denying Roe's motion.

III.

Joan Roe arrived at Saint Louis University looking forward to her college education and participation on the field hockey team. What followed is sad to relate: her sports injury, failing grades, ineligibility to travel with the team, her sexual

assault, and her subsequent departure from the university.  Nevertheless, Roe has failed to demonstrate a genuine issue of material fact on her claims that the University was deliberately indifferent to her and that it should be liable for negligence, misrepresentation, or breach of contract.  Nor has she shown that the district court abused its discretion or violated her constitutional rights in its handling of her case.

For these reasons we affirm the judgment of the district court.

_____