# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-2764

_____

Morgan Katelin Pearson; Kirsten Elizabeth Kirkpatrick

*Plaintiffs - Appellants*

v.

Logan University, doing business as Logan College of Chiropractic

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: April 17, 2019
Filed: September 4, 2019
[Published]

_____

Before SMITH, Chief Judge, KELLY and KOBES, Circuit Judges.

_____

PER CURIAM.

Morgan Katelin Pearson and Kirsten Elizabeth Kirkpatrick each sued Logan University under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688, as well as various state laws, alleging that Logan failed to protect them against stalking and sexual harassment by a fellow student (FS). The

district court granted summary judgment for Logan, which Pearson and Kirkpatrick appeal. We affirm.

I

We draw the following background facts from the summary judgment record, viewing the evidence in the light most favorable to Pearson and Kirkpatrick. See Schilf v. Eli Lilly & Co., 687 F.3d 947, 948 (8th Cir. 2012).

In September 2015, Pearson and Kirkpatrick enrolled as undergraduate students at Logan. Logan's academic catalog contains its harassment policy. According to the catalog, a student who wants to complain of stalking or sexual assault should contact Logan's Title IX Coordinator, who will commence an investigation within seven days of notification.

On December 8, 2015, Pearson met with Sandra Periello, Logan's Associate Dean of Students. Pearson complained that FS would come into the library — where she worked — to stare at her, that he would stare at her during chemistry lab, and that he once pressed himself up against her in November in the cadaver lab. Periello told Pearson to write down what happened to her and that Periello would give her statement to Shelley Sawalich, Logan's Dean of Students and Title IX Coordinator. On December 9, Periello emailed Pearson, reminding her to provide a written statement. Pearson responded by asking to meet with Sawalich, stating she believed another dean had allowed FS to take Pearson's same "complete schedule" in the next trimester. Sawalich and Pearson then exchanged emails to set up a meeting that same day.

At their December 9 meeting, Pearson repeated to Sawalich what she had told Periello with respect to FS's conduct and provided the names of four people who she said had witnessed the harassment. Pearson said that she was "terrified of being

raped." She also agreed with Sawalich that the November incident in the cadaver lab may have been an accident.

Sawalich labeled Pearson's allegations as harassment and stalking and said that she was required to investigate FS's conduct. Sawalich told Pearson that she had the option to remain anonymous as the complainant. Pearson asked how Sawalich would interview her witnesses while maintaining her anonymity, and Sawalich gave Pearson an example of the kind of question Sawalich would ask. Pearson elected to remain anonymous. Sawalich explained that she was not going to move forward with the investigation at the time because she had another case to "take care of" and Logan's finals and holidays were coming up, but told Pearson that before meeting with FS, she would email Pearson. Sawalich asked Pearson for a written statement, which she expected to receive from Pearson by Monday, December 14. She wanted the written statement "to assist with understanding the situation, interactions, and timeline" of relevant events.

On December 14, Pearson emailed Sawalich that she was "pinched for time" and asked, "Is it okay if I send it to you via email by next Monday?" On December 15, Sawalich responded, "You are welcome to get me the information next week . . . . What this means, though, is that I won't really be able to move forward until next trimester with the investigation. Is that okay with you?" Pearson did not respond to that question.

On December 21, Pearson sent her written statement to Sawalich. In her statement, Pearson claimed that at the beginning of the semester FS had made several attempts to spend time with her outside of class, wanting to study with her and waiting at the end of class to walk out with her. She stated that FS suggested they could drink beer while studying together, which she found inappropriate because he knew she was underage and did not drink. FS was in his early thirties. After she began working at the library, FS would come to the library every day and watch her,

trying to find opportunities to interact with her. She claimed that he would always sit at a nearby table and often appear to not be doing homework or other library-related work. She alleged that in class, FS would "try to jump into conversations" she was having with other people. Pearson also stated that she thought FS was trying to take her very same schedule in the next trimester, which made her uncomfortable because she believed he had no good reason to do so. Pearson made no mention in her statement of the November incident in the cadaver lab. Sawalich replied that same day, stating that she would review Pearson's statement and "call [FS] in to talk" after he returned to campus. Sawalich also stated, "I . . . want to reiterate that Logan's ability to meaningfully investigate the incident and pursue disciplinary action may be limited because of the attempt to maintain confidentiality."

Sawalich met with FS on January 8, 2016, and again on January 15, 2016, but did not email Pearson in advance of either meeting. Among other things, she told him there had been a complaint filed against him, and reminded him of Logan's policy against retaliation. On January 16, Pearson emailed Sawalich for an update, stating that FS continued to make her feel unsafe on campus. Sawalich responded that same day, telling Pearson she had met with FS twice and asking Pearson to meet on January 19, after the holiday weekend. At that meeting, Pearson told Sawalich that she continued to feel uncomfortable. She believed FS had followed her inappropriately at a school event and had stopped to watch as a female classmate measured her hip bone at the library. Sawalich told Pearson that FS had been very angry at their first meeting and that she had reiterated to FS at the second meeting that retaliation would be "frowned upon." Sawalich explained that she had not interviewed any of Pearson's witnesses because Sawalich did not believe that she could maintain Pearson's anonymity while doing so.

On February 1, Pearson met with Boyd Bradshaw, Vice President for Enrollment Management, to complain about Sawalich's handling of the investigation. On February 3, Pearson met with both Bradshaw and Sawalich to address her

concerns and to discuss reopening the case. They also agreed that FS would be asked to stay out of the library and instructed to have no contact with Pearson. Pearson decided to drop her request for anonymity.

Sawalich began reaching out to witnesses. Kirkpatrick was one of those witnesses. Sawalich interviewed Kirkpatrick on February 4. Kirkpatrick told Sawalich that on the first day of school, FS solicited her phone number by saying he was getting everybody's phone numbers, but after she gave him her number it seemed that she was the only one he asked. He started texting that Friday, wanting her to go to the library with him on Saturday. She eventually told him that she had a boyfriend, but FS continued to text her. Kirkpatrick stopped answering. In total, they exchanged approximately 15 texts that day. She told Sawalich that when she first met FS she thought he was "creepy," but she also said she "was fine now." Later, Kirkpatrick explained she said that because she did not want FS to be upset with her when he read Sawalich's findings. She also explained that before Sawalich emailed her, she had no plans to call or go see Sawalich, and that she had never communicated any complaints about FS's conduct before her February 4 interview.

On February 6, a Saturday, Pearson emailed Sawalich that she feared FS was retaliating against her because she heard that he was spreading rumors that Pearson had falsely accused another student at her old school of harassing her and that she is overly dramatic. On February 8, Sawalich responded that she was planning to meet with FS that same day and would address the alleged retaliation. When she met with FS, Sawalich told him that he was prohibited from going into the library during the duration of the investigation and from having any contact with Pearson.

On February 22, Sawalich emailed Pearson, explaining that she had talked with witnesses for both Pearson and FS, and that she was putting together information for a written report to Logan's Honor Council. She also asked Pearson for the text messages that Pearson had mentioned in her written statement and for clarification

as to whether Pearson ever told FS "in general terms that [Pearson] was not interested in interacting with him at all and that he should . . . leave [her] alone." On February 26, Sawalich and Pearson met once more. In response to Sawalich's question, Pearson explained that she had on "countless" occasions told FS not to talk to her and that she would ignore FS and reject his attempts to interact with her. Pearson also told Sawalich that she thought that FS was now blaming her for his poor academic performance. On February 28, Pearson wrote Sawalich that she was unable to retrieve any of the text messages and asked Sawalich to move forward without them.

In early March, Sawalich circulated a written report of her investigation to Logan's Honor Council, Pearson, and FS. Among other things, the written report stated that Sawalich had spoken to both Pearson and FS, that both Pearson and FS had identified potential witnesses, and that Sawalich had interviewed fourteen people in addition to Pearson and FS. The report summarized that "12 of the people said that they witness[ed] no interactions at all between [FS] and [Pearson] or very few interactions; nothing out of the ordinary." According to the report, one of the other witnesses said that she had "witnessed interactions between [FS] and the other girls in their classes that she found uncomfortable and she feels like he takes it further with [Pearson] . . . [and] that he is always around and staring." The other witness purportedly said that Pearson seemed "uncomfortable" around FS, and that FS had been asking questions about the work schedules of other students in the library. In addition to the written report, Sawalich also circulated summaries of her witness interviews, including her conversations with Pearson and FS. She did not circulate her handwritten notes.

Pearson believed that Sawalich was trying to blame her for the investigation and omitting information from her witnesses and otherwise twisting their words. She circulated a written response on March 6, and met with Boyd on March 7 to express her disappointment with the written report. Also on March 7, Sawalich interviewed an additional witness. She sent Pearson's and FS's written responses to the report,

as well as her notes from the additional witness interview, to the Honor Council. Pearson met with the Honor Council on March 8, and FS met with the Honor Council on March 10. On March 11, the Honor Council issued its decision, determining that there was insufficient evidence to find FS responsible for stalking and harassment. It also stated:

> There is to be no personal contact between you two. Neither of you may contact or attempt to contact the other. Due to the decision, there are no limitations to utilization of common space or campus resources. In clarity, you both may use Logan's facilities without limitations (I.e., LRC/Library, hallways, cafeteria, classrooms, etc.) but are prohibited from any personal social contact (i.e., calling, texting, etc.). In social settings, such as Logan sponsored events you should ignore each other.

Sawalich informed Pearson and FS that either student could have the Honor Council's decision reviewed by Kimberly O'Reilly, Logan's Vice President of Academic Affairs.

On March 14, Pearson and her mother met with Bradshaw and O'Reilly to discuss the review process, and on March 15, Pearson submitted a written request to have O'Reilly review the decision. On March 20, Pearson emailed O'Reilly that she did not feel safe on campus and was afraid to return to the library. On March 21, O'Reilly replied, reminding Pearson of the security and safety measures that were available to her on campus and to contact Sawalich immediately if FS violated the no-contact order. O'Reilly also reminded Pearson that—even though she had previously turned it down—she still had the option to switch to a work-study position outside of the library. On March 31, O'Reilly emailed Pearson, explaining that she would stay her decision on the appeal to give Pearson time to get phone records showing the text messages FS sent her. On April 4, Pearson met with O'Reilly and told her that she could not obtain the text messages. That same day, O'Reilly lifted her stay and rendered her decision, finding that "the process outlined in [Logan's harassment

policy] was followed and all evidence provided was reviewed [by the Honor Council]." By that fall, both Pearson and Kirkpatrick had transferred schools.

Pearson and Kirkpatrick sued Logan, claiming that Logan failed to adequately respond to their complaints about FS's conduct and that they left Logan in large part due to this inadequate response. Logan moved for summary judgment on all of Pearson's and Kirkpatrick's claims. The district court granted the motion, concluding that Pearson's Title IX claim failed because she could not show that Logan was deliberately indifferent to her plight, Kirkpatrick's Title IX claim failed because Logan never had actual knowledge that she was subject to sex-based discrimination, and their remaining negligence and premises liability claims failed because they did not demonstrate that Logan owed them a duty of care to protect them against student-on-student harassment. Pearson and Kirkpatrick appeal.

II

"We review a grant of summary judgment *de novo*, viewing the facts in the light most favorable to the nonmoving party." Walz v. Ameriprise Fin., Inc., 779 F.3d 842, 844 (8th Cir. 2015). "The non-moving party receives the benefit of all reasonable inferences supported by the evidence, but has the obligation to come forward with specific facts showing that there is a genuine issue for trial." Id. (quoting B.M. ex rel. Miller v. S. Callaway R-II Sch. Dist., 732 F.3d 882, 886 (8th Cir. 2013)).

A

Title IX addresses discrimination on the basis of sex in any educational program that receives federal funding. Roe v. St. Louis Univ., 746 F.3d 874, 881 (8th Cir. 2014). Under its terms, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to

discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX provides a private right of action, see Cannon v. Univ. of Chi., 441 U.S. 677, 717 (1979), which extends to suits for compensatory damages against any public or private entity other than a state, Fryberger v. Univ. of Ark., 889 F.3d 471, 475 (8th Cir. 2018). To succeed on a Title IX claim based on harassment by another student, a plaintiff must show that the educational institution was "(1) deliberately indifferent (2) to known acts of discrimination (3) which occur[red] under its control." K.T. v. Culver-Stockton Coll., 865 F.3d 1054, 1057 (8th Cir. 2017) (quoting Ostrander v. Duggan, 341 F.3d 745, 750 (8th Cir. 2003)). "Additionally, the discrimination must be so severe, pervasive, and objectively offensive that it can be said to deprive the victim of access to the educational opportunities or benefits provided by the school." Id. (cleaned up).

1

We begin with Kirkpatrick's Title IX claim, which the district court dismissed because it determined that Kirkpatrick could not show that Logan had actual knowledge that Kirkpatrick was subject to harassment by FS. There is no evidence that Logan knew of any complaints about FS's behavior before September 2015, when the only interactions that made Kirkpatrick uncomfortable occurred. And Kirkpatrick spoke to a Logan administrator about FS's behavior only once, in her February 4 interview with Sawalich. At that meeting, she told Sawalich that, although she used to think FS was creepy, she "was fine now." Viewing the evidence in the light most favorable to Kirkpatrick, she provided after-the-fact notice that she found limited interactions with FS at the beginning of the school year distressing. But such after-the-fact notice of limited interaction is insufficient to satisfy Title IX's actual knowledge requirement. See Culver-Stockton Coll., 865 F.3d at 1058. Because Kirkpatrick cannot satisfy the actual knowledge element, her Title IX claim fails as a matter of law and the district court properly granted summary judgment in favor of Logan on that claim.

We turn next to Pearson's Title IX claim, which the district court dismissed because it determined that Pearson could not show that Logan was deliberately indifferent to her complaints. As we have explained, "[a] school is deliberately indifferent when its 'response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'" Maher v. Iowa State Univ., 915 F.3d 1210, 1213 (8th Cir. 2019) (quoting Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 648 (1999)), cert denied, No. 18-1463, 2019 WL 2256264 (U.S. June 24, 2019). We have cautioned that the "clearly unreasonable" standard is "intended to afford flexibility to school administrators." Roe, 746 F.3d at 882. "[D]issatisfaction with [a] school's response does not mean the school's response can be characterized as deliberate indifference." Maher, 915 F.3d at 1213.

It is undisputed that Logan did investigate Pearson's allegations of stalking and harassment and that, even though its Honor Council ultimately determined that there was insufficient evidence to find FS responsible, it instructed Pearson and FS to have no contact with each other. In Maher, the university's investigative report revealed that the Title IX plaintiff had been sexually assaulted, but the university declined to move the alleged perpetrator before the investigation and hearing process had concluded. Id. at 1212. Nevertheless, we determined that instituting a no-contact order and giving the Title IX plaintiff housing alternatives so that she would not have to live in proximity to her assailant—which she declined—did not constitute deliberate indifference. See id. at 1212–13. Here, Logan's investigation did not conclude that FS engaged in stalking or harassment. But Logan still instituted a no-contact order and gave Pearson the option of taking a work-study position at a location other than the library. Pearson made no attempt to enforce that no-contact order or accept an alternative work-study position before leaving Logan. Nonetheless, Pearson contends that Logan was clearly unreasonable in its investigation and adjudication of her complaint.

The summary judgment record reveals no triable issue of fact as to whether Logan's response to and investigation of Pearson's complaint were clearly unreasonable. Any delays in investigating Pearson's complaint do not show that Logan ignored the harassment or stalking that Pearson described. Pearson complained of FS's behavior in December, shortly before the winter holidays. After Pearson described a continuing pattern of conduct that made her feel uncomfortable, Sawalich requested a written statement to better understand "the situation, interactions, and timeline" of relevant events. When Pearson requested additional time to prepare her statement, it was not clearly unreasonable for Sawalich to wait for Pearson before continuing her investigation. Possible student witnesses may also have had limited availability for interviews given that winter break started only five days later, and Pearson's request indicated that she was comfortable delaying the investigation. Indeed, when Sawalich specifically asked if it would be "okay with [Pearson]" if Sawalich began her investigation in earnest after the students had returned to campus, Pearson did not object. And Sawalich asked to speak to FS as soon as classes resumed and did speak to FS in early and mid-January, after which she determined that she could investigate no further while respecting Pearson's request for anonymity.

Pearson contends that Sawalich unreasonably delayed the investigation by not reaching out to other witnesses until Pearson dropped her anonymity in early February, but limiting the scope of an investigation out of respect for a Title IX complainant's desire for confidentiality does not by itself constitute deliberate indifference. See Roe, 746 F.3d at 883 (holding university was not deliberately indifferent where, among other things, university did not inform student's parents or professors of sexual assault out of respect for student's desire for confidentiality); see also Kesterson v. Kent State Univ., 345 F. Supp. 3d 855, 876 (N.D. Ohio 2018) (collecting cases), appeal docketed, No. 18-4200 (6th Cir. Dec. 5, 2018). After Pearson dropped her request for anonymity, Sawalich promptly reached out to

-11-

witnesses and instructed FS to stay out of the library during her investigation and to have no contact with Pearson.

Similarly, the Honor Council proceedings do not show that Logan was clearly unreasonable in its adjudication of Pearson's allegations against FS. Although Pearson contends that the Honor Council impermissibly relied on several statements in Sawalich's written report that misrepresented Sawalich's investigative findings, Sawalich also circulated summaries of her interviews to the Honor Council that allowed its members to reach their own conclusions. Moreover, Pearson had the opportunity to challenge Sawalich's presentation of the facts—both in writing and in person before the Honor Council—and did so. As for the Honor Council, its members did receive Title IX trainings, and its failure to adopt the Office of Civil Rights's suggested preponderance-of-the-evidence standard alone is insufficient to generate a dispute of material fact that may stave off summary judgment. See Butters v. James Madison Univ., 208 F. Supp. 3d 745, 759 (W.D. Va. 2016) (collecting cases for the proposition that a school's compliance or non-compliance with OCR guidance can be a factor to consider, but is not tantamount to deliberate indifference). Because there is no genuine dispute of material fact as to whether Logan was deliberately indifferent to any stalking or harassment that Pearson experienced, her Title IX claim fails as a matter of law. The district court properly granted summary judgment in Logan's favor on this claim.

III

Finally, we turn to the Missouri premises liability and general negligence claims. The district court dismissed these claims because it determined that Pearson and Kirkpatrick could not establish that Logan owed them a duty of care. We agree.

Under Missouri law, Pearson and Kirkpatrick must show that Logan University had a duty to protect them, breached that duty, and that breach proximately caused an

injury. Lopez v. Three Rivers Elec. Coop., 26 S.W.3d 151, 155 (Mo. banc 2000). As the district court correctly explained, whether a duty exists is a question of law. Id. As a general rule, a college does not owe a duty to protect its students. Nickel v. Stephens College, 480 S.W.3d 390, 401 n.8 (Mo. Ct. App. 2015) (acknowledging a "very narrow exception" in cases where a "special relationship" exists between a school and a student when "one party entrusts another for protection and relies upon that party to provide a place of physical safety").

There are two "special circumstances" under which Missouri recognizes an exception to this general rule, but they do not apply here. First, Missouri law recognizes that a "duty may arise when a person, known to be violent, is present on the premises or an individual is present who has conducted himself so as to indicate danger and sufficient time exists to prevent injury." Faheen v. City Parking Corp., 734 S.W.2d 270, 273 (Mo. Ct. App. 1987). Missouri courts have limited this exception to cases presenting "extraordinary danger." Id. at 274. Pearson and Kirkpatrick have not shown any facts in this case that would have alerted Logan to an extraordinary danger posed by FS. The only complaint involving any actual touching by FS was acknowledged to be a possible accident by Pearson. The other complaints involved potentially harassing conduct but nothing that would indicate extraordinary danger.

Second, Missouri law recognizes a duty where "specific incidents of violent crimes on the premises [] are sufficiently numerous and recent to put a defendant on notice, either actual or constructive, that there is a likelihood third persons will endanger the safety of defendant's invitees." Faheen, 734 S.W.2d at 273–74. Pearson and Kirkpatrick have alleged a history of misconduct of varying kinds at Logan. For example, they claim that in 2013 the school "discriminated against a pregnant student by giving her failing grades rather than 'incomplete' grades." But nothing they have alleged approaches the sort of violent, numerous, and recent crimes

-13-

that would be necessary to put Logan on notice that an unknown third party like FS could pose a danger to Pearson and Kirkpatrick's safety.

For these reasons, we affirm the judgment of the district court.

KELLY, Circuit Judge, concurring in part and dissenting in part.

I concur in Parts I and II of the court's opinion, but respectfully disagree with the court's conclusion in Part III.

In December 2015, Pearson notified Logan University administrators Shelley Sawalich and Sandra Periello that FS was stalking and harassing her, and that his conduct made her feel unsafe on Logan's campus. She also explained that FS had pressed himself up against her in the cadaver lab, making her extremely uncomfortable; and she told Sawalich that she was "terrified of being raped." In light of Pearson's complaints, Logan was on notice by December 2015 that FS was engaged in a continuing pattern of conduct that made at least one student feel that she was going to be physically assaulted. And, in January and early February, Pearson reported to Logan administrators that FS's behavior continued to make her feel unsafe on campus.

The fact that Pearson's complaints included only one instance of "actual touching" does not diminish the potential danger inherent in her allegations. Missouri law recognizes that an individual may "conduct[ ] himself so as to indicate danger" without having engaged in any physical contact. Cf. Faheen v. City Parking Corp., 734 S.W.2d 270, 273 (Mo. Ct. App. 1987). For example, a person seeking a protection order against stalking must demonstrate a "pattern of conduct" that causes "a fear of danger of physical harm." Binggeli v. Hammond, 300 S.W.3d 621, 623-24 (Mo. Ct. App. 2010) (quoting Mo. Ann. Stat. § 455.010). A pattern of conduct, in

turn, "may include, but is not limited to, following the other person or unwanted communication or unwanted contact." Id. (quoting Mo. Ann. Stat. § 455.010).

Here, Pearson informed Logan personnel of FS's alleged conduct that included unwanted physical touching, stalking, and harassment. While the record on this issue is admittedly thin, it is sufficient. Viewing the record in the light most favorable to Pearson and Kirkpatrick and giving them the benefit of all reasonable inferences, as we must on summary judgment, I believe they established, if just barely, the existence of a duty of care to protect them against FS. See Walz v. Ameriprise Fin., Inc., 779 F.3d 842, 844 (8th Cir. 2015).

The district court declined to address whether Pearson or Kirkpatrick could satisfy the other elements of their premises liability and negligence claims. Therefore, I would remand for the district court to make those determinations in the first instance. In the alternative, I would leave to the district court's discretion whether it wishes to continue exercising supplemental jurisdiction over the remaining state law claims on remand, in light of the dismissal of all federal claims. See Gregoire v. Class, 236 F.3d 413, 419 (8th Cir. 2000).

———————————————————