In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 22-2454

ISABELLE ARANA,

*Plaintiff-Appellant,*

*v.*

BOARD OF REGENTS OF THE UNIVERSITY OF WISCONSIN SYSTEM,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:20-cv-00856-wmc — **William M. Conley**, *Judge.*

———————————

ARGUED FEBRUARY 14, 2023 — DECIDED JULY 11, 2025

———————————

Before ROVNER, KIRSCH, and JACKSON-AKIWUMI, *Circuit Judges.*

JACKSON-AKIWUMI, *Circuit Judge.* This Title IX action arose from the University of Wisconsin-Madison's decision to readmit a star football player after expelling him for sexually assaulting two female students. The player submitted a petition for readmission shortly after a state court jury, deliberating a different charge using a different standard of proof, found

him not guilty of sexually assaulting the women. According to the petition for readmission—submitted mere weeks before the football season began—evidence developed at the state court trial cast doubt on the University's conclusion, after its own investigation, that the player committed sexual assault as defined by the student code of conduct. Under pressure from influential parties, and without hearing from the survivors of the alleged assault, the University Chancellor granted the petition.

One of the women, Isabelle Arana, responded by filing this suit. She alleges the school was deliberately indifferent to the sexual harassment she suffered. The district court dismissed the case after granting the University's motion for summary judgment. The court acknowledged a jury could conclude the University acted with deliberate indifference if it made its readmission decision in response to public pressure. But the court rejected Arana's argument that the harassment she suffered was actionable under Title IX because it deprived her of access to educational opportunities. We find, however, that there is a genuine dispute as to whether the harassment Arana experienced was so severe and whether the University's response was so clearly unreasonable that it had a detrimental effect on Arana's education. A reasonable jury could resolve these disputes in Arana's favor and find for her on her deliberate indifference claim. We therefore reverse the grant of summary judgment and remand the case for further proceedings.

## I

Isabelle Arana enrolled at the University of Wisconsin's main campus in Madison, Wisconsin, in 2017. She abruptly interrupted her studies and returned home to Chicago in

April of the following year. A few days later, Arana's father informed the University that Arana had been sexually harassed and assaulted by two members of the University's football team, Quintez Cephus and Danny Davis III, the day before returning home.

The following day, the University's Title IX coordinator, Lauren Hasselbacher, emailed Arana. She informed Arana the University had insufficient information to initiate an investigation and offered to speak with Arana to proceed. Within days, the Madison Police Department informed the school that Cephus was the subject of a criminal investigation. Cephus was then suspended from the football team. Around that time, Arana expressed interest in a no-contact order and the school issued one against both players. The directive applied indefinitely, and violations could result in disciplinary charges.

The University was initially proactive in enforcing the no-contact order. Hasselbacher herself emailed the Dean's Office to check whether Arana shared a class with either Cephus or Davis. Hasselbacher learned that Arana and Davis were in the same music class and worked with other administrators to separate the two.

Another woman ("Complainant 1") later contacted the University, alleging that she too was assaulted by Cephus the same night as Arana. She provided a written account to Hasselbacher alleging that Cephus had sexually assaulted her and Arana after they refused his advances. According to Complainant 1, the two women had been drinking heavily before accompanying Cephus to his apartment. Complainant 1 said that Arana appeared unconscious during the interaction due

to her intoxication and that Cephus enlisted Davis to take revealing photos of the two women without their consent.

Hasselbacher determined she had enough information to charge both Cephus and Davis with assaulting and harassing the women, and a formal disciplinary inquiry commenced. The investigation spanned four months, during which all parties were offered an opportunity to provide statements, present evidence, and meet with investigators accompanied by representatives of their choosing. The investigation culminated in a report detailing the evidence collected.

An assistant dean concluded that the evidence showed, more likely than not, that Cephus had committed Second Degree Sexual Assault, Third Degree Sexual Assault, and Sexual Harassment, as defined by University policy.[1] The assistant dean recommended Cephus be expelled and set the matter for consideration before a "Nonacademic Misconduct Hearing Committee." The parties were provided with all available evidence to review, and they and their representatives were afforded the opportunity to appear before the committee.

On the morning of the meeting, Cephus approached Arana in an attempt, according to Arana's attorney, to intimidate her. The attorney stepped between the two to defuse the

---

[1] "Second Degree Sexual Assault" encompassed sexual contact or intercourse with a person incapable of providing consent due to intoxication if the respondent had actual knowledge of the inability to consent. UNIVERSITY OF WISCONSIN-MADISON, POL'Y ON SEXUAL HARASSMENT & SEXUAL VIOLENCE, at 14 (2018). "Third Degree Sexual Assault" included "Sexual intercourse with a person without … consent." *Id.* at 15. And "Sexual Harassment" consisted of "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature [that] … creates a hostile environment." *Id.* at 14.

situation and reported the incident as a violation of the no-contact order.[2] A university official reminded Cephus of the no-contact order and warned that he must leave the area when coming into contact with Arana.

The disciplinary committee found that, by a preponderance of the evidence, Cephus was responsible for two of the three charges: Third Degree Sexual Assault and Sexual Harassment. Not only was Arana too intoxicated to consent to sexual intercourse, the committee ruled, she had also affirmatively denied permission. The committee further found that Cephus sexually harassed Arana by creating, intentionally or not, a hostile learning environment. The committee, however, reversed the Second Degree Sexual Assault charge after concluding the evidence was insufficient to support a finding that Cephus knew the level of Arana's intoxication. Cephus was nonetheless expelled based on the other two charges, a decision he appealed to the University's Chancellor, Rebecca Blank, and then to the Board of Regents. Both appeals were denied, and the investigation closed after more than twelve months.

The assistant dean ultimately found Davis not responsible for sexual harassment and neither Davis nor Cephus responsible for taking nude photographs of Arana. While Davis admitted to taking photographs of the women at Cephus's

---

[2] The University argues that this is hearsay because an assistant district attorney's deposition testimony described the event as conveyed to him by Arana's attorney. We of course may not consider inadmissible hearsay. *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016). But the record includes Arana's and her attorney's sworn accounts of the event. So, we need not rely on the purported hearsay.

direction, there was not sufficient evidence to establish that the women were naked in the photos.

After the school's Title IX investigation, Cephus's criminal case advanced to trial in the Dane County Circuit Court. Cephus faced a single charge of Second Degree Sexual Assault. WIS. STAT. ANN. § 940.225(2)(cm). Like the University's policy on Second Degree Sexual Assault, to be convicted of the Wisconsin equivalent, the jury had to find that Arana was "under the influence of an intoxicant to a degree which renders that person incapable of giving consent" *and* that Cephus had "actual knowledge" of Arana's inability to consent. *Id*. But unlike the University decisionmakers, who only had to decide whether Cephus was guilty by a preponderance of the evidence, the jury had to find Cephus guilty beyond a reasonable doubt. In essence, the jury was asked to convict Cephus of a charge the school had already found not supported by the evidence under the school's less stringent evidentiary standard. The jury did not convict. Following the acquittal, one juror said that surveillance videos shown at trial—purportedly showing that the women were not outwardly displaying signs of severe intoxication—were "important" because they showed "how the victims looked in [Cephus's] eyes."

Once acquitted in state court, Cephus filed a petition for readmission with Chancellor Blank. Although the initial Title IX investigation had spanned months, Cephus expected a response in two days, noting that "with the passing of each day, [his] ability to attend a Division I university and participate in athletics is compromised if not completely eliminated."

The petition was based on new evidence purportedly developed during Cephus's criminal trial that he claimed called into question the University's findings. Specifically, he cited

surveillance video, testimony from witnesses about their perception of the women's sobriety, and testimony that drew into question Complainant 1's credibility. The petition included a thumb drive with clips of the surveillance videos and a deposition transcript of one of the witnesses. Because "[t]he press for time [did] not allow for preparation of the trial transcript," however, Cephus "recount[ed] the [other] evidence at trial."

The University's general counsel was charged with reviewing all the evidence and submitting a written report identifying the most pertinent evidence for Chancellor Blank's consideration. Chancellor Blank rarely reviewed all the evidence, relying on her counsel to do so. The University's counsel reached out to Cephus's attorney about the trial transcript because the University believed "it to be an essential element in the chancellor's review of [Cephus's] petition." The prosecutor at the criminal trial later told the University it had to order the transcripts if it wanted to know what happened at trial. The University's counsel declined, saying time was of the essence. Chancellor Blank would later agree, saying a delay was not "tenable given the publicity this trial was getting," and Cephus deserved a response in a "timely" fashion, as it would not be fair for him to put his life on hold after a jury had acquitted him.

The Chancellor's team spoke to select individuals who had been at the trial, including Cephus's attorney, who University representatives conferred with multiple times. The University did not speak to Arana or any of her legal team, none of whom had been informed of the petition or given a chance to review the newly submitted evidence.

At the same time, the University received input from other interested parties. High-level donors pressured the

University to readmit Cephus quickly. Within 48 hours of receiving the petition, Chancellor Blank received letters from five donors who each had given at least $1,000,000 and possibly over $100,000,000 collectively to the University. The letter writing campaign was initiated by Ted Kellner, whose name adorned the University's football buildings; he had recently made a significant revocable pledge to the University.

The University also tracked fan sentiment, monitoring a social media hashtag referencing Cephus, which was often accompanied by an image of Cephus on the football field with an inscription reading, "Wisconsin Don't Delay, Let Cephus Play!" Many of the posts tagged Chancellor Blank personally in hopes she would see them.

Chancellor Blank further heard from the football program. The team wrote a letter urging her to readmit Cephus. Dozens of players took part in a press conference staged by Cephus and his legal team, perceived by the Chancellor to be part of a pressure campaign for Cephus's reinstatement. The team's head coach publicly proclaimed he would welcome Cephus back given the opportunity.

Eight days after the petition was filed, Chancellor Blank called Hasselbacher to inform her that she would readmit Cephus. Chancellor Blank said she faced a difficult situation where "both sides" might sue and she had to do what was right. She could not ignore the "fast and unequivocal jury decision" and though she "[did not] take lightly overturning process," she "[did not] see much other choice." Hasselbacher advised that the women should be given a chance to respond.

But the University declined the advice, as it was not required to by law.[3]

Five days later, Chancellor Blank readmitted Cephus by vacating the finding that he was responsible for Third Degree Sexual Assault (recall that this includes "[s]exual intercourse with a person without … consent" and the University had found that Arana was too intoxicated to consent and had affirmatively denied permission). UNIVERSITY OF WISCONSIN-MADISON, POL'Y ON SEXUAL HARASSMENT & SEXUAL VIOLENCE, at 15 (2018). According to the Chancellor, various witnesses consistently reported that the women consumed alcohol, but descriptions of their intoxication varied between "drunk," "very drunk," "buzzed," "tipsy," "hammered," "drunk but acting normal," and "blacked out." Regardless, Chancellor Blank believed the surveillance video corroborated that Arana did not "exhibit outward signs of incapacitation."

The Chancellor's decision did, however, uphold the sexual harassment finding against Cephus. But her rationale varied from the Board's, which relied on Cephus's continued presence creating a hostile learning environment. The Chancellor, in contrast, cited Cephus's admission to taking nude photos of the women without their consent. Because of this

---

[3] The Wisconsin Administrative Code at the time explicitly required that a complainant be notified of any change to the disciplinary outcome. WIS. ADMIN. CODE USW § 17.18 (2016). Chancellor Blank interpreted this to mean Arana should not be involved before a decision was made because the code did not expressly provide for her participation. The Wisconsin Administrative Code was amended a few years later to ensure that "[if] enrolled as a student at the time of the petition, the complainant shall be provided opportunity to respond to the petition prior to the readmission decision." WIS. ADMIN. CODE USW § 17.18 (2021).

and Cephus's history—including other incidents of harassment and lying during the police and University investigations—the Chancellor kept in place the no-contact order. Chancellor Blank was to personally notify several interested parties of her decision, including Kellner, the donor who recently made the revocable pledge to the University (the record does not indicate how many of the parties she in fact notified).

Arana returned to campus two weeks later for a new semester. Worried that the no-contact order would prove insufficient because Cephus had previously violated it, Arana and her counsel met with the University's Assistant Dean of Students and its Director of Threat Intervention Services hoping to develop a safety plan. In an about-face from their prior proactive stance, the two University personnel rejected Arana's concerns because they saw no actionable threat, and told her instead to try avoiding Cephus and to call 9-1-1 if she felt threatened.

Feeling the University's response left her on her own and fearful of encountering Cephus, Arana skipped classes, did not use the student union or communal study spaces, and avoided walking through parts of campus where she might run into Cephus. Arana also reduced her attendance at sorority events, opting to stay in her apartment or return home to Chicago on weekends. These changes required her to "work[] harder and longer hours to attain the same grades." Believing her fear and anxiety would limit her ability to succeed, she transferred from advanced to easier courses. Although she had been on track to graduate in three years, Arana's reduced courseload delayed graduation by a semester, which in turn delayed her matriculation into law school by a full year.

In June 2020, Arana filed a Title IX lawsuit against the University, alleging, in part, deliberate indifference to the sexual harassment that she experienced. Arana and the University filed cross motions for summary judgment. The University conceded that it had knowledge of sexual harassment: it never vacated its finding that Cephus had violated the school's policy on sexual harassment. But it argued that it was not liable under Title IX because Arana could not prove that the school was deliberately indifferent to the harassment or that the harassment deprived her of access to educational opportunities.

The district court disagreed with the University's argument that a reasonable jury could not find the school deliberately indifferent to the harassment Arana suffered. The district court disagreed because the decision to readmit Cephus "*appears* to have been driven by at best a desire to avoid any arguable liability for having suspended and expelled Cephus in response to his acquittal on criminal sexual assault charges less than two weeks before, *or* at worst, a desire to get an important player back on the football field in time for the opening of UW's football season." *Doe v. Bd. of Regents*, 615 F. Supp. 3d 877, 885 (W.D. Wis. 2022). But the district court agreed with the University that Arana could not show the harassment at the hands of Cephus deprived her of educational opportunities. In support of its conclusion, the court cited Arana's otherwise successful academic performance. The district court

therefore denied Arana's motion and granted the University's.[4]

Arana appeals the grant of summary judgment in favor of the University, arguing the district court erred in concluding no reasonable jury could find for her on all elements of her Title IX claim.

## II

Title IX was signed into law over 50 years ago to protect individuals from discriminatory sex-based practices in education and to prevent federal resources from being used to support such practices. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998). To achieve this goal, the law prohibits recipients of federal funds from causing anyone to "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity" based on sex. 20 U.S.C. § 1681(a). This prohibition has been interpreted expansively to give the law "a sweep as broad as its language." *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521 (1982).

The Supreme Court later recognized that Title IX includes an implied private right of action, *Cannon v. Univ. of Chi.*, 441 U.S. 677, 709 (1979), and that it permits schools to be liable not just for their own direct acts of discrimination, but also for indirect discrimination claims involving teacher-on-student sexual harassment if the school had actual notice of the harassment and was deliberately indifferent to it, *Gebser*, 524 U.S. at 292–93. Shortly after, the Court extended *Gebser*'s holding

---

[4] The district court also concluded that Arana could not prevail on a claim that the University directly discriminated against her. Neither party challenges that holding.

to cases involving student-on-student sexual harassment. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 633 (1999).

Under *Davis*, a successful Title IX claim based on student-on-student harassment requires the plaintiff to prove the following elements: First, the school or its officials had actual knowledge of sex-based harassment. 526 U.S. at 650; *see also Jauquet v. Green Bay Area Cath. Educ., Inc.*, 996 F.3d 802, 808 (7th Cir. 2021). Second, the harassment was "so severe, pervasive, and objectively offensive" as to deprive access to educational opportunities or benefits. 526 U.S. at 650. Third, the school's response was deliberately indifferent to the harassment. *Id.*

## III

"We review de novo a district court's decision on cross-motions for summary judgment, construing all facts and drawing all reasonable inferences in favor of the party against whom the motion under consideration was filed." *Kemp v. Liebel*, 877 F.3d 346, 350 (7th Cir. 2017). That means we are to construe the facts in favor of Arana and will affirm the district court's decision only if "there are no genuine issues of material fact." *Id.* On the other hand, if a reasonable jury, on the evidence presented, could return a verdict in favor of Arana on her Title IX claim, then we must reverse. *See Carmody v. Bd. of Trs. of Univ. of Ill.*, 893 F.3d 397, 401 (7th Cir. 2018).

We begin by determining what is within the scope of our review. The University's motion for summary judgment focused on two arguments: that Arana was not deprived of educational opportunities and that the University's response was not so unreasonable as to constitute deliberate indifference. Before us, the University makes the following additional

arguments: one instance of sexual harassment cannot be con-
sidered pervasive and the one instance of harassment is not
actionable because it occurred at a private apartment, an en-
vironment outside the University's control. The University al-
luded to the control argument in a footnote to its brief in sup-
port of summary judgment but, as Arana points out to us, the
University did not develop the argument until its summary
judgment reply brief, thereby waiving the argument. *O'Neal
v. Reilly*, 961 F.3d 973, 974 (7th Cir. 2020); *see also Costello v.
Grundon*, 651 F.3d 614, 637 (7th Cir. 2011) (declining to affirm
summary judgment on "alternative bases" that were "not
raised in the district court until the filing of the reply").[5]

---

[5] We disagree with our dissenting colleague that it is appropriate to
consider this line of argument. Even setting aside the fact that our caselaw
counsels against considering an argument developed only in a reply brief
on summary judgment, the record has not been sufficiently developed to
decide this fact-intensive issue. And the issue is, indeed, fact intensive.
Take, for example, the Ninth Circuit's decision in *Brown v. Arizona* finding
that a university had control over an off-campus housing facility where a
football player sexually assaulted other students. 82 F.4th 863, 878–79 (9th
Cir. 2023). This holding was based on several pieces of evidence. First, the
university's football program conditioned athletes' ability to live off cam-
pus on good behavior and had the authority to revoke the privilege. *Id.* at
878. Second, the university's Student Code of Conduct explicitly stated
that it "applie[d] to student conduct both on-campus and off-campus be-
cause off-campus misconduct can affect student health, safety, and secu-
rity as much as on-campus misconduct can." *Id.* (cleaned). Finally, a no-
contact order imposed in *Brown* "expressly applied both to on-campus
and off-campus spaces." *Id.* Even the Eighth Circuit case on which the dis-
sent relies limited its holding to the facts before it. *See Roe v. St. Louis Univ.*,
746 F.3d 874, 884 (8th Cir. 2014) ("We conclude that *on this record* ….). By
contrast, the parties here have not developed the factual record to a suffi-
cient degree. As such, we decline the University's invitation, which our
dissenting colleague accepts, to decide this issue for the first time without

The University arguably also waived its contention that the harassment was not pervasive. *Id.* But Arana does not argue that the issue was waived, instead addressing the argument's merits on appeal, and she thus waives any waiver argument. *Riemer v. Ill. Dep't of Transp.*, 148 F.3d 800, 804–05 n.4 (7th Cir. 1998). We therefore begin by examining whether the harassment experienced by Arana was severe, pervasive, and objectively offensive.

## IV

To constitute actionable conduct under Title IX, student-on-student harassment must be severe, pervasive, and objectively offensive. *Davis*, 526 U.S. at 633. The inquiry into whether harassment is actionable "depends on a constellation of surrounding circumstances, expectations, and relationships." *Id.* at 651. The severity and objective offensiveness of rape and sexual assault are not, and cannot be, in doubt. *See Baskervill v. Culligan Intern. Co.*, 50 F.3d 428, 430 (7th Cir. 1995) (actionable conduct in the Title VII context includes "sexual assaults" and "other physical contact, whether amorous or hostile, for which there is no consent express or implied"); *see also Vengalattore v. Cornell Univ.*, 36 F.4th 87, 103 (7th Cir. 2022) ("Because Title VII's discrimination prohibition overlaps Title IX's prohibition against sex discrimination in education programs … we have … long interpreted Title IX by looking to … the caselaw interpreting Title VII." (cleaned)). The remaining question is whether the harassment suffered by Arana was pervasive.

---

the benefit of a developed record, full briefing, or a decision from the district court.

The University claims that the harassment was not pervasive. As support, it cites language in *Davis* expressing skepticism that a single instance of harassment can form the basis of Title IX liability. The Court explained that severe, pervasive, and objectively offensive harassment will have a "systemic effect" on a student's education. *Davis*, 526 U.S. at 652. "Although, in theory, a single instance of sufficiently severe one-on-one peer harassment could be said to have such an effect" it found "it unlikely that Congress would have thought such behavior sufficient to rise to this level." *Id.* at 652–53. According to the University, our dissenting colleague, and two of our sister circuits, this conclusively means a victim of a single sexual assault can never recover under Title IX. Post, at 46; *Kollaritsch v. Michigan State Univ. Bd. of Trs.*, 944 F.3d 613, 620–21 (6th Cir. 2019); *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1059 (8th Cir. 2017).

Reading *Davis* plainly and with complete deference to its authority, we disagree, and we join three of our sister circuits in doing so. While the Court in *Davis* expressed skepticism at the sufficiency of alternative facts not then before it, it did not mandate hand-counting harassment. Given the potential life-altering and lasting impact of sexual assault, it is entirely conceivable that an instance of harassment may be sufficiently severe and pervasive to "differ markedly from the rarely actionable, theoretical single incident mentioned in *Davis* …." *Williams v. Bd. of Regents of Univ. Sys. of Georgia*, 477 F.3d 1282, 1298 (11th Cir. 2007). For this reason, several of our sister circuits—the First, Fourth, and Eleventh—have held that single incidents of harassment may create Title IX liability "if that incident were vile enough and the institution's response, after learning of it, unreasonable enough to have the combined systemic effect of denying access to a scholastic program or

activity." *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 172 (1st Cir. 2007); *see also Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 274 (4th Cir. 2021) ("Even a single incident of sexual harassment, if sufficiently severe, can inflict serious lasting harms on the victim—physical, psychological, emotional, and social."); *Williams*, 477 F.3d at 1297–98; *Hill v. Cundiff*, 797 F.3d 948, 973 (11th Cir. 2015).[6]

---

[6] In truth, the dissent's view that the Eleventh Circuit stands on the other side of this circuit split is a legible one. *Post*, at 48–49. In *Williams*, the Eleventh Circuit considered whether a female university student who was sexually assaulted by several male students on a single night had experienced sufficiently pervasive harassment under *Davis*. 477 F.3d at 1297–98. The Eleventh Circuit ultimately found the assault pervasive despite "occurring in one room over two hours" because the assailants undertook a "continuous series" of harassing actions such as conspiring to commit the gang rape and each assaulting Williams. *Id.*

Yet, when examined more closely, it is unclear whether *Williams* requires plaintiffs to present evidence that multiple instances of harassment occurred before a school had actual notice of the discrimination ("pre-notice harassment"). After all, Williams was assaulted over the course of a single evening. *Id.* at 1298. And rather than clearly stating that Williams had shown that she suffered more than one instance of pre-notice harassment, the Eleventh Circuit instead found that the assault differed "markedly from the rarely actionable, theoretical single incident mentioned in *Davis*." *Id.* To this end, two of our sister circuits read *Williams* to permit Title IX claims where only a single instance of harassment is alleged. *See Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 273 (4th Cir. 2021) (reading *Williams* to permit Title IX claims "even though the plaintiff alleged only a single incident of pre-notice harassment"); *Roe v. Cypress-Fairbanks Indep. Sch. Dist.*, 53 F.4th 334, 342–43 (5th Cir. 2022).

Even assuming the dissent's reading of *Williams* is correct, applying the Eleventh Circuit's logic to the record before us still supports our conclusion that the harassment Arana experienced was pervasive. After all, Arana, like Williams, presents evidence that Cephus was a "ringleader

We agree and adopt this standard because it promotes the appropriate balance between *Davis*'s twin aims of preventing students from being "denied access to educational benefits and opportunities on the basis of gender," 526 U.S. at 650, and only holding institutions liable for their "own failure to act," *id.* at 645. It recognizes the reality that while a student would reasonably feel apprehensive and fearful regardless of their school's response to a report of egregious harassment, that fear and apprehension casts a pervasive shadow across the student's schooling where administrators respond in an unreasonable manner.

The University argues that even if a single assault were actionable, they are not liable because *Davis* said that Title IX liability only attaches where a school's deliberate indifference "subjects its students to harassment." 526 U.S. at 644 (cleaned). They read this language to mean that they are not liable because it is not as if they responded insufficiently while Cephus committed further acts of sexual harassment. This reading unduly narrows *Davis*. Just after the quoted language, *Davis* states that a school's response "must, at a minimum, cause students to undergo harassment *or make them liable or vulnerable to it*." *Id.* at 645 (emphasis added).[7] *Davis* is

who lured the victim to his territory" and conspired with Davis to harass Arana by taking nonconsensual photographs of her. *Williams*, 477 F.3d at 1298. She also presents evidence that Davis penetrated her vagina several times. These events, as in *Williams*, occurred in a continuous series over the course of a single evening. *Id.* Like the Eleventh Circuit, we believe that these events "differ markedly" from the nonactionable single incident considered in *Davis*.

[7] The circuits are split as to whether this means that a Title IX plaintiff must show that the school's deliberate indifference after receiving notice of student-on-student harassment resulted in further concrete acts of

more inclusive than the University alleges and would extend liability to instances where a school's response puts a student at further risk of harassment. We therefore hold that Title IX monetary liability can extend to a single pre-notice instance of egregious harassment where the educational institution's response was clearly unreasonable under the totality of the circumstances.[8]

For her part, Arana has presented sufficient evidence (including her own and other witnesses' prior statements to University personnel and campus police) for a jury to conclude that the harassment she experienced on that April evening

harassment or simply left the student more vulnerable to future acts of harassment. *See Roe v. Cypress-Fairbanks Indep. Sch. Dist.*, 53 F.4th 334, 342–43 (5th Cir. 2022) (recognizing 4-3 split in favor of no requirement to show further post-notice acts of actual harassment while declining to take a position). On one side of the split stand the Sixth, Eighth, and Ninth Circuits, holding that a school can be deliberately indifferent only when its actions result in a further incident of harassment. *Kollaritsch v. Mich. State Univ. Bd. of Trs.*, 944 F.3d 613, 621 (6th Cir. 2019); *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1058 (8th Cir. 2017); *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 740 (9th Cir. 2000). The other side of the split consists of the First, Fourth, Tenth, and Eleventh Circuits, which hold that a school's actions need only make harassment more likely. *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 172 (1st Cir. 2007), *rev'd on other grounds*, 555 U.S. 246 (2009); *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 274 (4th Cir. 2021); *Farmer*, 918 F.3d at 1105; *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1295–97 (11th Cir. 2007).

[8] The dissent casts this holding as a "strained interpretation" of *Davis*. *Post*, at 35, 58. Yet, it is the dissent's own interpretation that strains against *Davis*'s plain text. Our colleague presumes, without explanation, that *Davis*'s "context" compels a requirement of further harassment. *Id.* at 56. But we, like the First, Fourth, Tenth, and Eleventh Circuits before us, find that the dissent's formulation "overly distills the rule set forth by the *Davis* Court." *Fitzgerald*, 504 F.3d at 172.

was sufficiently egregious as to be pervasive. Not only does she present evidence that Cephus sexually assaulted her, but that Cephus penetrated her vagina with his fingers and then his penis several times. She was unconscious throughout the assault. Cephus even enlisted Davis in between the assaults to help him take revealing photographs of her.

We discuss the jury issue as to the insufficiency of the University's response *infra* in Part VI.

## V

We next turn to Arana's argument that the severe, pervasive, and objectively offensive harassment that she suffered deprived her of educational opportunities and benefits, contrary to the district court's ruling. This relates to our inquiry into the severity of the harassment, as the harassment must, as outlined above, be severe enough to have "systemic effect[s]" on the student's education. *Davis*, 526 U.S. at 652–53. Put plainly, courts look to see whether the harassment "had a 'concrete, negative effect' on the victim's access to education." *Gabrielle M. v. Park Forest-Chi. Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 821 (7th Cir. 2003) (quoting *Davis*, 526 U.S. at 654).

In *Davis*, the Supreme Court explained that a drop in the plaintiff's grades provided "necessary evidence of a potential link" between the harassment and the plaintiff's education. 526 U.S. at 652. The Court did not, however, impose a threshold requirement that plaintiffs must demonstrate a decline in grades to succeed in a Title IX action. Indeed, courts have recognized a variety of other suitable evidence demonstrates a "concrete negative effect." *Id.* at 652; *see, e.g., Gabrielle M.*, 315 F.3d at 823 (increased absenteeism); *Wamer v. Univ. of*

*Toledo*, 27 F.4th 461, 471 (6th Cir. 2022) (changed course of study); *Doe v. Sch. Dist. No. 1*, 970 F.3d 1300, 1312–13 (10th Cir. 2020) (missed in-person instruction and socialization opportunities); *Farmer v. Kansas State Univ.*, 918 F.3d 1094, 1104–05 (10th Cir. 2019) (lost scholarship, withdrawal from extracurriculars, and avoidance of campus areas without escorts).

Arana, for her part, contends the district court misstated the law. Facially, the district court's decision dismissed the idea that "proof of declining grades or absenteeism" was a prerequisite for Title IX liability. *Doe v. Bd. of Regents*, 615 F. Supp. 3d at 886. But the court nonetheless emphasized grades and absenteeism above all else. The court found it important that Arana continued participating in student groups and successfully graduated with a strong GPA in under four years. While mostly true, this characterization paints an overly rosy picture.

The University recognized in its original Title IX investigation that sharing a campus with her assailant would create a hostile environment for Arana. Crucially, Arana has explained over the course of this litigation how that environment affected her education. Her anxiety prevented her from using certain campus resources. She skipped classes, did not use the student union or communal study spaces, and stayed away from certain parts of campus. Given these disruptions, she had to "work harder and longer hours to attain the same grades," and transferred from advanced courses to easier courses. Ultimately, she graduated with good grades in only three and a half years, but she entered college expecting to graduate in three years based on credits carried from high school. That extra semester delayed her entry to law school by a year. Further, she reduced her attendance at sorority events,

choosing to return to Chicago many weekends rather than socialize.

The University posits that, if anything, these effects are attributable to its readmission of Cephus and not the harassment he caused. *See Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 274–75 (4th Cir. 2021) ("[T]he main object of inquiry for this prong is the alleged sexual harassment, rather than the defendant's response thereto. Indeed, the latter is relevant only to the issue of deliberate indifference." (cleaned)). In support, the University marshals evidence that the effects Arana described did not begin right after the assault.

This position ignores our caselaw finding that a victim of a violent assault is denied equal access when they graduate early with a limited diploma "rather than stay and complete the work needed for a full … diploma." *Doe v. Galster*, 768 F.3d 611, 619 (7th Cir. 2014) (citing *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655 (2d Cir. 2012)). That reasoning applies in this context with equal strength where there is evidence that Arana struggled greatly after the assault and delayed her own graduation. *See Doe*, 1 F.4th at 275 (directing factfinders to "consider all of the surrounding circumstances … and an appropriate sensitivity to social context" when undertaking this inquiry).

The University's causal argument also stretches too far. For instance, in this case, the University's decision forced Arana to share a campus with her assailant. It was this campus environment that in part caused Arana's struggles, and the environment was caused by the assault. True, one link in the causal chain was the University's decision to readmit Cephus. This in no way detracts from the clear line one can draw between the assault and the detrimental effects Arana now

describes. *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1739 (2020 (recognizing events often have multiple causes).

If a jury were to find that the University's readmission decision was clearly unreasonable, *see infra* Part VI, then it could appropriately rely on Arana's testimony that she delayed her graduation, spent most of her time alone, or left campus entirely to find that the harassment and the University's unreasonable response negatively affected her education in a concrete way.

The University appears to also question whether the hostile environment could have a systemic effect given Arana and Cephus overlapped for only one semester between his readmission and his departure to pursue a professional football career. We see no reason to mandate an artificial threshold for the amount of time that need pass before an effect can be considered systemic. Even if we did, we would not go so far as the University to categorically draw that line beyond one semester's worth of harassment. We have no problem envisioning that one semester's interruption can adversely affect, or even completely derail, a student's education. Arana's assertions, if credited, establish as much.

Fundamentally, the district court and University incorrectly gauge the nature of education. To distill a student's education to "good" or "bad" academic achievements leaves "unanswered … the full spectrum of success that female students *might have achieved*" had they not been subject to discrimination and "excuse[s] discrimination because its victims are resilient enough to persist" in its face. *Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 135 (4th Cir. 2022) (Keenan, J., concurring). A reasonable jury could rely on the dropped classes, changed courseload, and delayed graduation to find a

material impact on Arana's academic performance, regardless of whether her grades suffered.

If Arana's testimony is credited, the harassment she suffered ultimately left her unable to enjoy the full panoply of educational opportunities that made her classmates' experiences enriching. This is sufficient to establish deprivation of educational opportunities because, after all, education is more than academics.[9]

## VI

Where does this leave us? At this point a reasonable jury could conclude that Arana experienced severe, pervasive, and objectively offensive harassment after being sexually assaulted and this fomented a hostile environment, having profound effects on her academic and social life. But the fact that Arana experienced harassment while studying at the University of Wisconsin would not entitle her to damages from the University. Title IX imposes liability for "subject[ing]," *Davis*, 526 U.S. at 643, others to discrimination or making them "vulnerable to it," *id.* at 645, so "a recipient of federal funds may be liable in damages under Title IX only for its own misconduct." *Id.* at 640. This means the University cannot be liable

---

[9] As the Rape, Abuse and Incest National Network ("RAINN") references in its amicus brief, Chancellor Blank acknowledged the following in her remarks about returning to in-person instruction after the COVID-19 pandemic shuttered campus: "It is the connections and interactions that make UW-Madison a great university and that bring students here for a high-quality residential learning experience." Brief for RAINN as *Amicus Curiae* at 17–18 (citing Chancellor Blank, *Creating the New Normal: Returning to Campus*, UNIVERSITY OF WISCONSIN: BLANK'S SLATE (Mar. 25, 2021), https://chancellor.wisc.edu/blog/creating-the-new-normal-returning-to-campus/).

for the harassing conduct of Cephus unless its own deliberate indifference to the harassment subjected Arana or made her vulnerable to discrimination. *See id.* at 646–47.

The University maintains that it was never deliberately indifferent to Arana's accusations of harassment because its "response was immediate, vigorous, and sustained." It points to the ways the school supported Arana after she came forward with her allegations and how it expelled Cephus after a thorough investigation. But the adequacy of the University's initial Title IX investigation is not in dispute. Instead, Arana argues that the school was deliberately indifferent when it readmitted Cephus. The University believes that we cannot selectively examine one part of its response. What it seems to miss is that the challenged action, Cephus's readmission, effectively nullified the initial Title IX investigation. Regardless of how proper a school's initial response, Title IX would be undone if a school could avoid liability by vacating a disciplinary decision comporting with Title IX using a process that does not.

The University insists that the Chancellor overturned the initial decision in response to legitimate changed circumstances: a not guilty verdict and trial evidence showing Cephus was not responsible for sexual assault. This argument has a certain logic: A school should be able to make a good-faith evaluation of newly presented evidence that might change a prior disciplinary decision without running afoul of Title IX. Arana presents evidence, however, that suggests the University's decision to readmit Cephus was not the product of a reasoned and good-faith reexamination but undue influence. For instance, the University did not wait for the trial transcript, did not contact Arana about the new evidence or

to ask for other evidence from the trial, and yet it heard from numerous influential parties adverse to Arana's interests.

The University rightly points out that Wisconsin law did not require the Chancellor to involve Arana in the readmission process. It maintains that the Chancellor therefore followed state law and cannot be deliberately indifferent. It may be true that the law did not require Arana's participation, but it also did not seem to forbid it. Regardless, there is no need to decide whether a school can be deliberately indifferent when following state law. There is sufficient evidence apart from the exclusion of Arana from the readmission process that could lead a jury to conclude that the University unreasonably readmitted Cephus because of a desire to further the football program's interests.

That sufficient evidence is this: Although the initial investigation spanned more than a year, the decision to readmit Cephus concluded within weeks, just in time for the start of the football season. The University contends that most of the legwork had been done during the initial investigation and Chancellor Blank needed to consider only a few pieces of new evidence. However, there is no escaping the fact that the timeline looks suspicious: Cephus's petition for readmission came shortly before the football season commenced and demanded a favorable decision immediately. Layer on top of that influential donors, fans, and the football program all making the same demand and one could reasonably conclude that Cephus's readmission was meant to placate a growing chorus calling for just that result. For this reason, we disagree with the University's argument that, ultimately, the true motive behind readmitting Cephus is inconsequential. A jury would be well within its rights to find the University was

deliberately indifferent to known harassment simply to avoid angering key boosters and interest groups. Of course, it is possible to view the evidence—particularly Chancellor Blank's sworn testimony attesting to her nonmonetary motivations—and conclude that the Chancellor came to her conclusion independent of these demands, but at this point we must make all reasonable inferences in favor of Arana. *See Carmody*, 893 F.3d at 401.

Alongside the suspicious timing, the new evidence the University presents does not undermine its conclusions during the original Title IX investigation as much as the University suggests. According to the University, critical to the Chancellor's decision was a police interview with Complainant 1 where she described an interaction with Arana and Cephus: "[I said something] like we're leaving, we're going home, or something, and [Cephus] was like no, like come back in 20 minutes. And I was like what do you need 20 minutes for. And [Arana] was like sex." But the University omits context that supports the conclusion that Arana was too intoxicated to provide consent. Complainant 1 continued: "[Arana] was like, her eyes were rolling to the back of her head. And he's like come back in 20 minutes. He's like get out of my room right now. And then I got mad at [Arana] and I was like are you really going to have sex with someone who just talked to me like that. And she was like not even responding." This context makes the evidence less convincing, suggesting the University presents it now as pretext.

The same can be said about other evidence that the Chancellor alluded to in her readmission decision. The Chancellor highlighted testimony from witnesses who observed the two women before the incident; she noted their descriptions of the

women's appearances ranged from "drunk" to "buzzed" to "black out." But these witnesses' observations, along with the Chancellor's own belief that the women did not show "outward signs" of incapacitation in security footage captured before they arrived at Cephus's apartment, primarily addressed the outward appearance of the women and not their actual level of intoxication and resulting ability to consent to sex. This evidence, therefore, is most pertinent to a violation of the University's prohibition against Second Degree Sexual Assault, which requires actual knowledge of a person's inability to consent—and was the charge the University already decided *not* to levy against Cephus. Their testimony is not as probative of the charge the University *did* initially find Cephus guilty of and vacated with the readmission—namely Third Degree Sexual Assault, which lacks a knowledge requirement. Indeed, Arana's version of events that she drank heavily and was later unable to consent when alone with Complainant 1 and Cephus remains largely uncontradicted and supported by other evidence that the University had access to from the beginning. This includes texts Arana sent Complainant 1 the next morning asking if Complainant 1 was sure that Cephus and Arana had a sexual encounter and seeking details of the encounter.

None of this is to say that a school can be held liable under Title IX simply because an official draws the wrong conclusion from a good-faith evaluation of the evidence. Even if a school wrongly concludes that harassment did not occur when the evidence shows that it did, it cannot be held liable under Title IX unless that decision was clearly unreasonable. *See Gabrielle M.*, 315 F.3d at 824 ("[A]s long as the school's response is not 'clearly unreasonable,' it cannot have acted with the requisite deliberate indifference to incur Title IX

liability.") (quoting *Davis*, 526 U.S. at 648–49). The decision to readmit Cephus was not clearly unreasonable solely because it may have been predicated on a mistaken reading of the evidence. We are even willing to accept the Chancellor's characterization of the case as containing "ambiguity." But because of the apparent weaknesses in the new evidence, coupled with the intense pressure the Chancellor was under to readmit Cephus, a jury could decide to not credit the Chancellor's testimony that donor money did not influence her and instead conclude that the University cited the new evidence as mere pretext to readmit a student because of a public pressure campaign. And sacrificing Arana's interest in an educational environment free from sex discrimination on the altar of the football program could be seen as clearly unreasonable by a jury.[10]

---

[10] The dissent posits that evidence of a pressure campaign is improper and speculative. *Post*, at 51–53. We agree that a plaintiff cannot avoid summary judgment based on "testimony … speculating as to [the defendant's] state of mind, or other intuitions, hunches, or rumors." *Widmar v. Sun Chemical Corp.*, 772 F.3d 457, 460 (7th Cir. 2014); FED. R. CIV. P. 56(c); FED. R. EVID. 602; *see Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) (collecting cases where *testimony* that adverse action was taken with discriminatory intent could not defeat summary judgment). There is a difference between speculative testimonial evidence and the circumstantial evidence here. *Widmar*, 772 F.3d at 460–62 (rejecting testimony claiming employer acted with discriminatory intent while reiterating that circumstantial evidence can establish impermissible motive). Arana does not rely on mere assertions of intent but points to letters from donors, news conferences, and an acknowledgment from the University that it was under pressure to readmit Cephus. The dissent takes the Chancellor at her word that she tuned this pressure out. But that is not our call to make; it is a jury's. *See Norton v. Sam's Club*, 145 F.3d 114, 119 (2d Cir. 1998) (one "who discriminates is unlikely to leave a smoking gun … attesting to a discriminatory intent." (cleaned)). And while the evidence of discrimination Arana presents is

No matter, the University believes it has an ace up its sleeve in the form of the no-contact order. The argument goes something like this: even if the school unreasonably readmitted Cephus, the University's entire response was not clearly unreasonable because Cephus was directed not to contact Arana, providing her some modicum of safety. *See C.S. v. Madison Metro. Sch. Dist.*, 34 F.4th 536, 543 (7th Cir. 2022) (en banc) ("[A] response does not have to be perfect or even successful."). We are not in the business of scrutinizing every last disciplinary decision by substituting our judgment for that of school administrators. *Gabrielle M.*, 315 F.3d at 825. Moreover, schools need not default to expulsion in response to accusations of sexual harassment to avoid Title IX liability. *Johnson v. N.E. Sch. Corp.*, 972 F.3d 905, 912 (7th Cir. 2020). We do not suggest that the University had to expel or maintain the expulsion of Cephus in lieu of issuing a no-contact order. But even if a no-contact order was an appropriate response to the assault in this case, Arana submitted evidence that suggests the University had no interest in enforcing the order after Cephus's readmission. If this evidence is credited, a jury could reasonably conclude that the University's response to harassment was clearly unreasonable.[11]

---

circumstantial rather than direct, that does not make it less probative. *United States v. Rose*, 12 F.3d 1414, 1417 (7th Cir. 1994). We draw, as we must, all reasonable inferences from this evidence in Arana's favor, *Kemp*, 877 F.3d at 350, and leave for the jury the ultimate question of whether to credit those inferences or credit the Chancellor's testimony and other evidence in the University's favor.

[11] This conclusion does not conflict with *Johnson* and *C.S.* as the dissent suggests. *Post*, at 53, 55. We have made clear that the law does not require expulsion. Further, the dissent asserts that if the schools in those two cases avoided liability by telling the alleged assailant to avoid the

The University points us to two facts showing it genuinely intended to enforce the no-contact order. First, it says that Cephus never violated the no-contact order after he was readmitted. But that may be the result of Arana's actions more than the University's. Title IX's protections would mean little if a school could avoid liability by relying on students to protect themselves by curtailing engagement in educational opportunities, the very result the law seeks to prevent. Second,

plaintiff but did not go so far as excluding the assaulter from school grounds then the University cannot be liable for doing the same here. But the dissent glosses over facts distinguishing those cases from the one before us. The most significant one is the lack of evidence that the schools in those cases showed reluctance to enforce the disciplinary measures put in place (a no-contact order in *Johnson*, 972 F.3d at 908, and a verbal directive to cease the troubling behavior in *C.S.*, 34 F.4th at 546). The dissent believes that it can say for certain that the University did not express hesitation in enforcing the no-contact order and that it was positively the order, and not Arana's own curtailment of her education, that prevented Arana and Cephus from seeing each other. We, on the other hand, recognize the conflicting evidence regarding the efficacy of the no-contact order. We may not usurp the jury's role to resolve that conflict. *See Runkel v. City of Springfield*, 51 F.4th 736, 741–42 (7th Cir. 2022).

Unlike the University, the school in *Johnson* was otherwise incapable of expelling the harassing student. Neither Johnson nor the student who raped her, Froschauer, cooperated with the school's investigation, meaning that there was no way for the school to take greater disciplinary action as such action would have been unsupported by sufficient evidence. 972 F.3d at 909. Additionally, had the school expelled Froschauer, it would have risked violating the state court's protective order specifically allowing him to attend classes. *Id.* at 909–10. The school therefore approved Johnson's requested for a homebound learning exemption to avoid having classes with Froschauer. *Id.* at 909. While this did not eliminate the possibility that the two would cross paths at school, it indicates that the school did everything in its power to limit the students' interactions because it felt it had a responsibility to do so.

the University points out that administrators met with Arana to hear her concerns about the continued enforcement of the no-contact order. But there is substantial disagreement about what happened at that meeting. A jury could infer a lack of interest in enforcing the order if it accepts Arana's characterization that the administrators simply told her to contact police if she felt unsafe. This response could be seen as standing in marked contrast with the University's prior proactive enforcement of the no-contact order, especially considering that Cephus had, by then, already allegedly violated the order once before. And any lessened zeal at enforcing the no-contact order after Cephus's readmission would be even more notable, a jury could conclude, because Cephus had previously violated the no-contact order at the very time and place one would expect him to be on his best behavior. A jury could rationally conclude that Arana had reason to fear that someone who would violate the order at such a time and place might do it again, anywhere.

A jury is of course free to accept the University's framing that it was not dismissive of Arana and would have acted if there was a more acute threat. It is not our role, however, to decide the strength of competing evidence. That is a role for the jury to play, and we must allow it that opportunity. *See Davis*, 526 U.S. at 654 ("The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974))).

## VII

At its core, the University's arguments ask us to accept the parts of the record that suggest it acted reasonably while ignoring the parts of the record that suggest otherwise. Whereas

our dissenting colleague takes the University up on its proposal, we decline to do so at this stage of the proceedings as it is the role of the jury to weigh the evidence. We also decline to view each piece of evidence in isolation. When we view the following evidence holistically, we conclude that a reasonable jury could find for Arana: (a) the coordinated campaign to pressure the University to readmit Cephus, (b) the speed of the readmission decision relative to the start of the football season, (c) the decision not to wait for a transcript of the criminal trial, (d) the decision to not notify Arana or give her an opportunity to be heard prior to the readmission decision, (e) the differing charges and standards of proof at play in the criminal and disciplinary proceedings, and (f) the discrepancy between the University's treatment of the no-contact order before and after readmission. Together, this evidence paints a portrait of an educational institution that, in a reasonable jury's eyes, may have been deliberately indifferent to sexual harassment on its campus.

Therefore, we REVERSE the district court's grant of summary judgment in the University's favor and remand for further proceedings consistent with this opinion.

KIRSCH, *Circuit Judge*, dissenting. Title IX of the Education Amendments Act of 1972 bars federally funded schools from engaging in sex discrimination. In *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), the Supreme Court recognized that student-on-student harassment can amount to school-sanctioned sex discrimination. However, to eliminate any risk that schools would be held responsible for their students' misconduct rather than for their own official decision to permit sex discrimination, the Court imposed a high bar for establishing liability that can only be met in certain limited circumstances. Section by section, the majority's opinion erodes these carefully crafted limitations. The effect is the creation of a new, practically limitless Title IX standard—one that would be unrecognizable to the *Davis* Court.

Consider the limitations that schools only need to respond to peer harassment that occurs in their programs or activities and is so severe, pervasive, and objectively offensive that it has the systemic effect of denying the victim equal access to an educational opportunity or benefit. The Court expressly said in *Davis* that a single instance of harassment does not meet this standard. But the majority holds otherwise, dismissing the language in *Davis* as mere dicta. To make matters worse, it does so in a case where the single instance of harassment did not even occur in the University of Wisconsin's programs or activities.

The majority's application of deliberate indifference is similarly difficult to comprehend. While it acknowledges that courts "are not in the business of scrutinizing every last disciplinary decision by substituting our judgment for that of school administrators," that is exactly what the majority does. *Ante*, at 30. Based on nothing more than speculation about the

University's motives and doubts that it made the right decision to readmit Quintez Cephus, the majority holds that a jury could find the University's response amounted to deliberate indifference. Even if there were an evidentiary basis for believing the University's readmission decision was made in bad faith—and there isn't—nothing in the record suggests that its no-contact order was ineffective, let alone a clearly unreasonable response to Isabelle Arana's alleged assault. It is undisputed that following Cephus's readmission, Arana never saw him again on campus, and the school never learned of any further contact between the two. No reasonable juror could find that the University's response amounted to deliberate indifference under these circumstances.

Finally, a school isn't liable under *Davis* unless its deliberate indifference subjects students to harassment. That means Arana must have experienced additional harassment as a result of the University's allegedly inadequate response. But the majority reads this limitation right out of *Davis*. Its strained interpretation—that a student need only be left vulnerable to the possibility of further harassment—provides no limit at all. When a school is deliberately indifferent to severe, pervasive, and objectively offensive harassment in its programs and activities, students are always left vulnerable to further harassment. If this requirement is to mean anything, it must mean something more than that.

The majority cannot ignore *Davis* in favor of applying its own view of what the "appropriate balance" is between preventing harassment and subjecting schools to liability. *Ante*, at 18. I respectfully dissent.

I

I accept Arana's allegations and testimony as true at summary judgment. See *Osborn v. JAB Mgmt. Servs., Inc.*, 126 F.4th 1250, 1258 (7th Cir. 2025). But that "does not extend to drawing inferences that are supported by only speculation or conjecture." *Id.* (quotation omitted).

A

In late April 2018, Isabelle Arana's father reported to the University of Wisconsin that Quintez Cephus had sexually assaulted Arana at his off-campus apartment. The Dean of Students Office contacted Arana the same day, providing information about the University's resources and rights for sexual assault victims. The Dean of Students Office also contacted Arana's professors to inform them that Arana had been the victim of a sensitive crime and asked for their understanding in making academic accommodations. The day after, the University's Title IX Coordinator, Lauren Hasselbacher, emailed Arana information about support resources and potential protective measures at her disposal, such as no-contact directives. The next day, Cephus was suspended from the football team indefinitely. Hasselbacher informed Arana a few days later that Cephus had been suspended from the team because he was the subject of a Madison Police Department criminal investigation. In response, Arana requested a no-contact order against Cephus and Danny Davis III (a fellow student and football player who was present the night of the alleged assault but later found not responsible for any misconduct).

Hasselbacher issued no-contact orders to both Cephus and Davis the next day. The orders remained in effect indefinitely

and required them to avoid all contact with Arana (emphases in original):

> After receiving allegations of sexual miscon-
> duct, *I am issuing a No Contact Directive prohibit-*
> *ing you from having any contact with Isabelle*
> *Arana.* Contact refers to any intentional words
> or actions including, but not limited to: tele-
> phone calls, text messages, instant messages,
> emails, Facebook, Twitter, or other forms of so-
> cial media ….

> If you have incidental contact, *it is your responsi-*
> *bility to remove yourself from the situation as quickly*
> *as possible under the circumstances*, to take means
> to separate, and to avoid further contact. Failure
> to do so could give reasonable inference of in-
> tentional, rather than incidental, contact and be
> a violation of this order.…

Hasselbacher sent Arana copies of the no-contact orders the same day.

Less than a month after issuing the no-contact orders, and after receiving more information from Arana and another student who also alleged that Cephus had assaulted her the same night as Arana, the University opened an official investigation into Cephus. Hasselbacher issued Cephus a Notice of Charge informing him that he was under investigation for possible violations of the University's policy against sexual assault and sexual harassment. It also reminded Cephus of his no-contact order. The Notice of Charge kicked off a Title IX investigation and disciplinary process against Cephus that spanned more than a year.

In late August 2018, the Dane County District Attorney's Office filed criminal charges against Cephus. In light of the charges, Hasselbacher immediately reached out to Arana to ask if she had any concerns about returning to school or requests regarding her safety or academic accommodations. Cephus's attorney demanded that the University delay the investigation due to the criminal case against his client, but the University's investigation pressed on. As the fall 2018 semester approached, Hasselbacher also checked with the Dean of Students Office to ensure that Arana had no classes that would overlap with Cephus or Davis. When Arana's father informed Hasselbacher that Arana had music class with Davis, an assistant dean went to the class to ensure he complied with the no-contact order. Hasselbacher immediately spoke with Arana's attorney about the class overlap, apologized for the oversight, and asked whether Arana believed that Davis had made intentional contact with her. Hasselbacher also spoke with Davis's attorney to discuss alternatives so that he and Arana would not be enrolled in the same class. Davis dropped the class that day.

Hasselbacher presented her Final Investigative Report to the University's Office of Student Conduct in October 2018. The decision whether to sanction Cephus based on the report's findings was left to Assistant Dean Ervin Cox. Three weeks after receiving the report, Cox concluded that Cephus was responsible for sexual harassment and second- and third-degree sexual assault. Cox recommended expulsion.

In January 2019, a three-member misconduct committee held a hearing on the findings and proposed sanction for Cephus. While waiting for the hearing to begin, Cephus walked toward Arana. Arana's attorney perceived Cephus as walking

in a threatening manner, so she stepped in front of him to prevent physical contact. Arana's attorney reported the incident to an assistant dean at the hearing. The assistant dean immediately spoke to Cephus and reminded him that under the no-contact order, if he saw Arana, he needed to walk in the other direction and remove himself from the area.

The committee unanimously found Cephus responsible by a preponderance of the evidence for third-degree sexual assault and sexual harassment. It also concluded that he was not responsible for second-degree sexual assault. By a 2-to-1 vote, the committee upheld the expulsion sanction. On March 13, 2019, Chancellor Rebecca Blank affirmed the committee's findings and sanction recommendation, and Cephus was officially banned from campus three days later.

B

On August 2, 2019, after a week-long criminal trial, a jury acquitted Cephus after 35 minutes of deliberation. Four days later, Cephus filed a petition seeking readmission to the University. State law vested the readmission decision in the chancellor. See Wis. Admin. Code § UWS 17.18 (2016). The petition was 242 pages long, including exhibits. Cephus's attorneys also sent the University a jump drive with approximately 70 video clips. After the petition was filed, Blank received many emails from alumni, donors, employees, students, and members of the public asking her to grant or deny Cephus's petition for many different reasons. Several influential donors wrote to Blank urging her to readmit Cephus. Blank spoke with one of them, Ted Kellner, and told him what she told everyone else: that she appreciated his commentary and would make a decision after looking at the evidence. Blank testified that she was struck by the speed of the verdict, which

persuaded her that she needed to take the petition seriously and look at the additional evidence. Blank enlisted the University's vice chancellor for legal affairs and two other attorneys from its Office of Legal Affairs to help her work on the petition.

The vice chancellor tried to order a copy of the transcript from Cephus's trial, but he was told by the court reporter that, even on an expedited basis, it would take at least several months to produce. Blank testified that it was not tenable to wait multiple months for the transcript. In her view, time was of the essence because the University was going to start soon, and if Cephus was going to be readmitted, she would make that decision within a month. She further explained that waiting was not a viable choice given the publicity the trial was getting and because the University had to respond in a timely manner to Title IX issues.

On August 19, Blank granted Cephus's petition. In her decision, she wrote that substantial amounts of information were not available to the University during the Title IX investigation and disciplinary proceedings, which affected the University's prior findings. Specifically, she concluded that the evidence fell short of the preponderance of the evidence standard required to find Cephus responsible for third-degree sexual assault. Blank upheld the University's finding of sexual harassment, however, based on Cephus's admission in a police interview and at trial that he enlisted Davis to photograph Arana and the other complainant partially unclothed and without their consent. Blank reduced Cephus's sanction from expulsion to a suspension effective from March 13 to the date of decision, thereby readmitting him for the fall semester. But Blank also determined that the

no-contact order prohibiting Cephus from making any contact with Arana would remain in effect, and she warned that any additional misconduct would likely result in serious discipline. The University informed Arana of the reinstatement decision later that morning.

In early September, the director of the University's Threat Intervention Services met with Arana and her attorneys. Arana was terrified about Cephus being on campus and expected the University to develop a safety plan. But although Arana and her attorneys expressed her fears about running into Cephus and other football players, they provided no information about previous contact with any football players or statements by anyone on campus that could be construed as threats or harassment. Arana and her attorneys also did not indicate that Cephus had violated the no-contact order. Because Arana provided no actionable information, the director concluded additional safety measures were not warranted at that time and advised Arana to call 911 if she felt threatened and to avoid Cephus if she saw him around campus.

After Cephus returned to the University, he never tried to call, write, or contact Arana, and Arana never saw him on campus. No one else on campus ever said anything to Arana about what happened with Cephus. Arana continued to receive support services and academic accommodations from the University. Following the fall semester, Cephus left the University to enter the NFL draft.

## II

Title IX of the Education Amendments Act of 1972 provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the

benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The statutory scheme gives administrative agencies authority to enforce the guarantees of Title IX. *Id.* § 1682; see also *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 288 (1998). But in *Cannon v. University of Chicago*, 441 U.S. 677 (1979), the Supreme Court held that victims also have an implied right of action. *Id.* at 717. If a school engages in sex discrimination, it can be found liable for damages to the students it discriminated against. *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 76 (1992).

In *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), the Court clarified that student-on-student harassment can amount to school-sanctioned sex discrimination. *Id.* at 633. But to ensure that schools would only be held responsible for their own discriminatory practices, and not for the misconduct of their students, the Court placed significant restrictions on when peer harassment could give rise to Title IX liability. *Id.* at 640–43 (imposing a "high standard" that creates liability only "in certain limited circumstances"). First, the school must have actual knowledge of actionable sexual harassment in its programs or activities. *Id.* at 633, 650. Second, the school's response must be clearly unreasonable in light of the circumstances, such that it amounts to deliberate indifference. *Id.* at 648. Third, the school's deliberate indifference must subject its students to harassment. *Id.* at 644.

A

Schools do not have a duty to act under *Davis* unless they are aware of actionable sexual harassment in their programs or activities. *Id.* at 633. Sexual harassment is only actionable if it is "so severe, pervasive, and objectively offensive that it

effectively bars the victim's access to an educational opportunity or benefit." *Id.* The majority says the alleged off-campus assault satisfies this standard. *Ante*, at 15–20. That conclusion is wrong twice over. First, unsupervised and unsponsored off-campus activity does not occur in a school's programs or activities. Second, a single instance of sexual harassment is not sufficiently pervasive or widespread to have "the systemic effect of denying the victim equal access to an educational program or activity." *Davis*, 526 U.S. at 652.

1

Start with the requirement that the harassment take place in a school's programs or activities. Title IX only prohibits sex discrimination that occurs "under" "the operations of" a school receiving federal funds. 20 U.S.C. §§ 1681(a) & 1687. In *Davis*, the Court explained this means the harassment "must take place in a context subject to the school['s] control" such that the school "exercises substantial control over both the harasser and the context in which the known harassment occurs." 526 U.S. at 645. For example, the harassment in *Davis* took place during school hours and on school grounds—much of it in the classroom. *Id.* at 646. The Court recognized that the elementary school's authority over its students in this context was "comprehensive," "custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults." *Id.* (quotations omitted).

Here, the alleged assault occurred in a privately owned apartment building in the middle of the night. Nothing in the record indicates the University exercised any supervision or control in this context, nor does Arana suggest she entered the apartment building to attend a University-sponsored program or activity. Instead, Arana argues that the University

had the authority to discipline Cephus for his off-campus misconduct because he was a student at the University and the school's written policies permitted it to do so. While that may be true, it only establishes the University's control over Cephus, not any control over the context in which the alleged assault occurred. Remember, *Davis* requires "substantial control over *both* the harasser *and* the context in which the known harassment occurs." *Id.* at 645 (emphases added). Absent any evidence of the latter, the alleged assault is not actionable harassment.

The Eighth Circuit reached the same conclusion in *Roe v. St. Louis University*, 746 F.3d 874 (8th Cir. 2014). Roe was raped during a private party in an off-campus apartment. *Id.* at 878–79. She argued that "the University had disciplinary control over the rapist because he was a student and that universities may control certain off campus behavior due to the nature of the relationship between students and the institution." *Id.* at 884. But the Eighth Circuit held that "a University must have had control over the situation in which the harassment or rape occurs" and "there was no evidence that the University had control over the student conduct at the off campus party." *Id.*; see also *Ostrander v. Duggan*, 341 F.3d 745, 750–51 (8th Cir. 2003) (finding no control where the university "did not own, possess, or control" the off-campus premises where the alleged assault occurred); accord *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 366 (6th Cir. 2012) ("When conduct occurs … off school grounds entirely, the school district has control over neither the harasser, nor the context.") (quotation omitted).

The majority largely avoids this issue. It says the University waived this argument by merely alluding to it in a

footnote in its opening brief before the district court. *Ante*, at 14. But the University did more than allude to this argument. It stated unequivocally that "[a]n off-campus sexual assault, without evidence of any on-campus harassment, cannot give rise to a Title IX claim," and included case citations to support its view. Arana understood the University's argument and addressed it in her response brief. That the district court did not consider the argument when it granted summary judgment is of no consequence. "We may affirm summary judgment on any ground supported by the record, as long as the parties adequately presented the issue before the district court and the nonmoving party had an opportunity to contest it." *King v. Hendricks Cnty. Comm'rs*, 954 F.3d 981, 984 (7th Cir. 2020).

The majority also says in a footnote that "the record has not been sufficiently developed to decide this fact-intensive issue." *Ante*, at 14 n.5. For support, it points to evidence that the Ninth Circuit found relevant in *Brown v. Arizona*, 82 F.4th 863 (9th Cir. 2023), such as the fact that the school could discipline its students for off-campus misconduct. *Id.* at 878. As an initial matter, much of the evidence the *Brown* court found relevant is already in the record, including the scope of the no-contact order and the University's policies concerning off-campus misconduct. See *id.* at 878. But more fundamentally, both the majority and the Ninth Circuit's decision in *Brown* err in conflating evidence of control over the harasser with evidence of control over the context in which the harassment occurs. The fact that a school can discipline students for off-campus misconduct bears on its control over the harasser, but it says nothing about the school's control over particular off-campus environments. See *id.* at 887–89 (Rawlinson, J., dissenting). Under the majority's preferred approach, however,

a school would exercise control over every context in which two of its students interact, no matter how unrelated to its educational programs or activities, so long as its disciplinary policies gave it the authority to punish off-campus misconduct. That approach is incompatible with both the text of Title IX and *Davis*.

*Davis* does not mandate that schools police the conduct of their students whenever and wherever it occurs. 526 U.S. at 644–45. School officials are only responsible for student misconduct in environments within their supervisory authority. *Id.* That includes settings like classrooms, school grounds, school buses, and other school-supervised or sponsored activities that take place off campus. See *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 713–14 (4th Cir. 2018) (Agee, J., concurring in part and dissenting in part) (collecting cases). But it does not include unsupervised and unsponsored activities in a privately owned, off-campus apartment building. In that context, peer harassment neither occurs in a school's programs and activities nor is reasonably attributable to the school when it fails to act.

2

Even if we ignore the fact that the alleged assault did not occur in the University's programs or activities, a single instance of peer harassment is not actionable under *Davis*. 526 U.S. at 652–53. Rather, the sexual harassment must be so severe, pervasive, and objectively offensive that it has "the systemic effect of denying the victim equal access to an educational program or activity." *Id.* at 652. While the *Davis* Court posited that "in theory, a single instance of sufficiently severe one-on-one peer harassment could be said to have such an effect," it found it "unlikely that Congress would have thought

such behavior sufficient [given] the inevitability of student misconduct and the amount of litigation that would be invited by entertaining [such] claims." *Id.* at 652–53. Accordingly, the Court decided that foreclosing liability for "claims of official indifference to a single instance of one-on-one peer harassment" would best "reconcile the general principle that Title IX prohibits official indifference to known peer sexual harassment with the practical realities of responding to student behavior, realities that Congress could not have meant to be ignored." *Id.*; see also *Gebser*, 524 U.S. at 285 (explaining that the Court's task is to infer how Congress would have addressed the issue).

The majority acknowledges this passage in *Davis* yet nonetheless holds that the University can be held liable for a single instance of egregious harassment. *Ante*, at 15–19. To the majority, the Court's reasoning was merely dicta that we can disregard. *Id.* at 16. That is a remarkable proposition. *Davis* set out a comprehensive framework to limit the new cause of action the Court was creating. The Court's discussion of conduct that does not suffice to create liability is integral to understanding how this framework should be applied. We are not entitled to ignore the Court's determination of what Congress would have intended and decide for ourselves what the "appropriate balance" is between preventing harassment and subjecting schools to liability. *Id.* at 17. While the First and Fourth Circuits have similarly held that a single instance of peer harassment can be actionable, the persuasive force of their reasoning is limited by the fact that neither court meaningfully grapples with the relevant passage in *Davis*. The Fourth Circuit did not mention it in *Doe v. Fairfax County School Board*, 1 F.4th 257 (4th Cir. 2021). *Id.* at 273–74. And the First Circuit relegated it to a footnote in *Fitzgerald v. Barnstable*

*School Committee*, 504 F.3d 165 (1st Cir. 2007). *Id.* at 173 n.3. And neither decision suggests, as the majority now does, that the Court's discussion was simply dicta.

The majority says the Eleventh Circuit has taken a similar view. *Ante*, at 16–17 & n.6. But the two cases it cites both involved more than one instance of harassment, "markedly" distinguishing them from the "theoretical single incident mentioned in *Davis*." *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1298 (11th Cir. 2007); *Hill v. Cundiff*, 797 F.3d 948, 973 (11th Cir. 2015) (quotation omitted). In fact, the Eleventh Circuit expressly stated in both cases that more than one instance of harassment is required to make out a *Davis* claim. See *Williams*, 477 F.3d at 1297 ("[G]ender discrimination must be more widespread than a single instance of one-on-one peer harassment ….") (quotation omitted); *Hill*, 797 F.3d at 972 ("To be severe, pervasive, and objectively offensive, the behavior must be serious enough to have a 'systemic effect' of denying equal access to an education. A 'single instance of sufficiently severe one-on-one peer harassment' cannot have such a systemic effect in light of 'the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment.'") (quoting *Davis*, 526 U.S. at 652–53). In a footnote, the majority says the Fourth and Fifth Circuits read *Williams* to permit Title IX claims based only on a single instance of pre-notice harassment. *Ante*, at 17 n.6. But those circuits were referring to another passage in *Williams* that concerns a separate element of *Davis* claims: whether there needs to be additional instances of post-notice harassment. *Roe v. Cypress-Fairbanks Indep. Sch. Dist.*, 53 F.4th 334, 343 (5th Cir. 2022) (citing *Williams*, 477 F.3d at 1295–97); *Fairfax Cnty. Sch. Bd.*, 1 F.4th at 273 (citing *Williams*, 477 F.3d at 1295–97). That is a different issue

altogether from the threshold question of whether a single instance of pre-notice harassment is actionable under Title IX.

The weight of authority confirms that the passage in *Davis* means what it says: a single instance of peer harassment is not enough to establish liability. See *Kollaritsch v. Mich. State Univ. Bd. of Trs.*, 944 F.3d 613, 620–21 (6th Cir. 2019); *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1059 (8th Cir. 2017); *Williams*, 477 F.3d at 1297–98; see also *Davis*, 526 U.S. at 677 (Kennedy, J., dissenting) (observing that the majority's systemic intent requirement "exclude[s] the possibility that a single act of harassment perpetrated by one student on one other student can form the basis for an actionable claim").

In Section V of its opinion, the majority goes on to explain how Arana's alleged sexual assault had a systemic, concrete, and negative effect on her education. *Ante*, at 20–24. Because *Davis* categorically precludes finding that a single instance of harassment can have such an effect, I do not address this portion of the majority's opinion, except to say I disagree that the facts in the record are sufficient to show the alleged assault "so undermine[d] and detract[ed] from [Arana's] educational experience, that [she was] effectively denied equal access to [the University's] resources and opportunities." *Davis*, 526 U.S. at 651.

B

Apart from the lack of actionable harassment, the University also isn't liable under *Davis* because its response to the alleged assault did not amount to deliberate indifference. Deliberate indifference means the school's response is "so unreasonable, under all the circumstances, as to constitute an official decision to permit discrimination." *C.S. v. Madison Metro.*

*Sch. Dist.*, 34 F.4th 536, 543 (7th Cir. 2022) (en banc) (quotation omitted); accord *Davis*, 526 U.S. at 648. This standard is intentionally high "to eliminate any risk" that a school will be held liable for the acts of others rather than its own decision to permit sex discrimination. *Id.* at 643 (quotation omitted). All it requires is that a school "respond to known peer harassment in a manner that is not clearly unreasonable." *Id.* at 649. "This is not a mere reasonableness standard," and courts are fully capable of deciding the question as a matter of law in appropriate cases. *Id.* (quotation omitted).

Our case law applying this standard has emphasized that Title IX neither grants plaintiffs the right "to make particular remedial demands," *id.* at 648, nor "force[s] funding recipients to suspend or expel every student accused of misconduct," *Gabrielle M. v. Park Forest-Chi. Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 825 (7th Cir. 2003). A school's "response does not have to be perfect or even successful" to meet this standard. *C.S.*, 34 F.4th at 543. Instead, schools "'continue to enjoy the flexibility they require' in disciplinary decisions unless their response to harassment is 'clearly unreasonable.'" *Doe v. Galster*, 768 F.3d 611, 619 (7th Cir. 2014) (quoting *Davis*, 526 U.S. at 648–49). "And we will not second guess a school's disciplinary decisions—even a school's decision not to impose any disciplinary measures—so long as those decisions are not clearly unreasonable. Indeed, judges make poor vice principals." *Johnson v. Ne. Sch. Corp.*, 972 F.3d 905, 912 (7th Cir. 2020) (cleaned up).

The majority and I agree that the University's response before the readmission decision satisfies this standard, and that the University had the ability to revisit and reverse its prior disciplinary decision even if it ultimately reached the wrong

conclusion. *Ante*, at 24–25, 28. We also agree that the University did not need to maintain Cephus's expulsion from campus in lieu of continuing to enforce its no-contact order, which remained in place after Cephus was readmitted. *Id.* at 29. Nevertheless, the majority says a reasonable jury could find that the University was deliberately indifferent because there is evidence that it (1) acted in bad faith when it decided to readmit Cephus, and (2) did not intend to enforce the no-contact order. That conclusion ignores the limits of our review under Title IX and is unsupported by the record.

1

The majority believes a reasonable jury could find that the University readmitted Cephus in bad faith. It says the timing of Cephus's readmission was suspicious, there was intense pressure on Blank to readmit Cephus, and the new evidence included in Cephus's petition did little to undermine the University's prior findings. So it concludes that a reasonable jury could find Blank's reliance on this additional evidence was pretextual. The implication is that there is evidence Blank let Cephus back on campus to appease donors, the football program, and its fans. But the majority's chain of inferences is not supported by the evidence and ignores the limits of our review under Title IX.

Consider the majority's suspicions about the timing of the University's decision. The majority says that "the decision to readmit Cephus concluded within weeks, just in time for the start of the football season," which "looks suspicious." *Ante*, at 26. But the majority's suspicion about timing is not evidence of anything. And oddly missing from its discussion is Blank's sworn testimony about her legitimate motivations for proceeding swiftly, including her concern that the fall

semester was going to start very soon, and that the University needed to make a decision within a month to ensure that Cephus, if readmitted, would be able to start school on time. Nothing in the record suggests that Blank was lying or that she made her decision "simply to avoid angering key boosters and interest groups." *Id.* at 26. "Personal knowledge can include reasonable inferences, but it does not include speculating as to [a school's] state of mind, or other intuitions, hunches, or rumors." *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 460 (7th Cir. 2014).

Next, the majority reasons that because the new evidence Blank considered "does not undermine" the University's original findings "as much as the University suggests," a jury could find the readmission decision was based on pretext. *Ante*, at 26. The majority is effectively saying that because the University did not make the "right" decision, there is a genuine dispute as to whether it made its decision in good faith. That is hard to square with the majority's own acknowledgement that "a school [cannot] be held liable under Title IX simply because an official draws the wrong conclusion from a good-faith evaluation of the evidence." *Id.* at 28. If the primary evidence of pretext here is the fact that a reasonable jury could disagree with the conclusions the University drew from the evidence, the line between honest mistake and bad faith collapses.

Such a close examination of the record also ignores the limits of our review under Title IX. Remember, "we will not second guess a school's disciplinary decisions—even a school's decision not to impose any disciplinary measures— so long as those decisions are not clearly unreasonable." *Johnson*, 972 F.3d at 912. The majority's interrogation of the

University's readmission decision ignores this cautionary language, chiding Blank for relying on evidence that was "not as probative" and because additional context made certain evidence "less convincing." *Ante*, at 28. In doing so, the majority applies something more akin to the "mere reasonableness standard" the Court expressly rejected in *Davis*. 526 U.S. at 649 (quotation omitted).

2

Even if the University's readmission decision was made in bad faith, no reasonable jury could find that its overall response was so clearly unreasonable that it amounted to deliberate indifference. The University's investigation, disciplinary proceedings, support for Arana, and no-contact order effectively separated Arana and Cephus the entire time they overlapped on campus. The University issued a no-contact order to Cephus as soon as Arana requested one, less than a week after learning of her allegations. And the single time the University learned that Cephus might have violated his no-contact order at the January 2019 disciplinary proceeding, it immediately stepped in and warned him not to do so again. After his readmission, the no-contact order remained in effect, Cephus never tried to contact Arana, and Arana never saw him on campus again.

The majority agrees that the University did not need to maintain Cephus's expulsion in lieu of enforcing the no-contact order. *Ante*, at 29. And for good reason. We have regularly found that schools are not deliberately indifferent when they've taken similar steps to minimize contact between a victim and her assailant. See, e.g., *Johnson*, 972 F.3d at 909–15; *C.S.*, 34 F.4th at 545–48; cf. *Lapka v. Chertoff*, 517 F.3d 974, 983–85 (7th Cir. 2008) (reaching a similar conclusion in the

Title VII context). Instead, the majority says there is "evidence that suggests the University had no interest in enforcing the [no-contact] order after Cephus's readmission." *Ante*, at 30. Specifically, it references Arana's meeting in September 2019 with the director of the University's Threat Intervention Services, where, Arana says, the director advised her to call 911 if she felt threatened and to avoid Cephus if she saw him around campus.

These statements do not reasonably suggest that the University did not intend to enforce the no-contact order after Cephus's readmission. Suggesting Arana call 911 if she felt threatened and avoid Cephus if she saw him (i.e., common-sense advice) does not indicate the University would have allowed Cephus to violate his no-contact order without consequence. Holding otherwise, as the majority does here, would permit a plaintiff to defeat summary judgment any time she harbors a subjective suspicion that her school will not enforce its disciplinary decisions. At summary judgment, we don't credit speculative theories lacking evidentiary foundation. *Widmar*, 772 F.3d at 460.

Significantly, neither Arana nor her attorneys provided any information, in the September meeting or afterward, about any violation of the no-contact order. "The standard set out in *Davis* is not satisfied by knowledge that something might be happening …. School administrators have actual knowledge only of the incidents that they witness or that have been reported to them." *Galster*, 768 F.3d at 617–18. The only time Arana reported an alleged violation of the no-contact order was before Cephus's expulsion, and the University acted swiftly in response. The director's advice does not create a genuine dispute of material fact when it is undisputed that

the University kept a no-contact order in place and never learned of any violation or further harassment by Cephus.

We reached a similar conclusion in *C.S.* There, a middle school principal became aware that an employee had an inappropriate grooming relationship with the student-plaintiff. 34 F.4th at 546. Near the end of the student's seventh grade year, the principal told the employee to "limit the hugs and physical contact with [the student], avoid interacting with her in private settings, and set strong boundaries in his relationship with her." *Id.* at 546 (cleaned up). Unbeknownst to the principal, the employee repeatedly and horrifically sexually abused the student during her eighth grade year. *Id.* We held that the principal's response to known discrimination "was not so unreasonable as to amount to deliberate indifference to discrimination." *Id.* at 547 (quotation omitted). The principal's discussion with the employee satisfied the district's obligations under Title IX, we said, because the record showed the principal "reasonably believed she had succeeded in minimizing his physical contact with [the student], since she received no further reports raising new concerns." *Id.* And because the principal had learned of nothing further that would indicate the employee was not going to heed the principal's earlier warning, there was no "obligation for [the principal] to take further action." *Id.* at 547–48.

Like the principal in *C.S.*, the University had no obligation to take additional action when it never learned of any further interaction between Arana and Cephus.

## C

Finally, even if a school is deliberately indifferent to actionable harassment in its programs and activities, it still isn't

liable under *Davis* "unless its deliberate indifference subjects its students to harassment." 526 U.S. at 644 (cleaned up); see also *id.* at 640–41 ("The [University] itself must … subject persons to discrimination under its programs or activities in order to be liable under Title IX.") (cleaned up). That means Arana must have experienced further harassment after her father notified the University about the alleged sexual assault. *Kollaritsch*, 944 F.3d at 622.

The majority holds otherwise, concluding that the University's response only needed to put Arana at risk of further harassment, even if none occurred. *Ante*, at 18–19. It relies on a statement in *Davis* which says that a school's "deliberate indifference must, at minimum, cause students to undergo harassment or make them liable or vulnerable to it." 526 U.S. at 645 (cleaned up). In the majority's view, the use of the disjunctive "or" means students do not have to undergo further harassment to make out a claim so long as they are made liable or vulnerable to it. When read in isolation, the majority's interpretation of the clause "or make them liable or vulnerable to it" is plausible. But "the language of an opinion is not always to be parsed as though we were dealing with language of a statute." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979). Instead, the Court's opinion "must be read with a careful eye to context." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 374 (2023).

With context, it is clear the Court was simply elaborating on what it means to "subject" students to harassment. See *Davis*, 526 U.S. at 645 (citing to dictionaries defining the term "subject"). And this requirement—that plaintiffs must be *subjected* to harassment—presumes that further harassment has actually occurred. See *Kollaritsch*, 944 F.3d at 628–29 (Thapar,

J., concurring) ("To be 'subjected' to a harm, as a matter of ordinary English, requires that you experience that harm."). The sentence the majority relies on merely provides two ways a school's inadequate response can subject its students to further harassment. Its response "might (1) be a detrimental action, thus fomenting or instigating further harassment, or it might (2) be an insufficient action (or no action at all), thus making the victim vulnerable to, meaning unprotected from, further harassment." *Id.* at 623 (majority opinion). But either way, there still must be further harassment. *Id.* at 622–23. In other words:

> The *Davis* Court described wrongful conduct of both *commission* (directly causing further harassment) and *omission* (creating vulnerability that leads to further harassment). The definition presumes that post-notice harassment *has* taken place; vulnerability is simply an alternative pathway to liability for harassment, not a free-standing alternative ground for liability. [T]he vulnerability component of the … definition was not an attempt at creating broad liability for damages for the *possibility* of harassment, but rather an effort to ensure that a student who experiences post-notice harassment may obtain damages regardless of whether the harassment resulted from the institution *placing* the student in a position to experience that harassment or *leaving* the student vulnerable to it.

Zachary Cormier, *Is Vulnerability Enough? Analyzing the Jurisdictional Divide on the Requirement for Post-Notice Harassment in Title IX Litigation*, 29 Yale J.L. & Feminism 1, 23–24 (2017).

The Court in *Davis* went to great lengths to emphasize the "very real limitations" it put in place to narrowly circumscribe the scope of Title IX liability for peer harassment. *Davis*, 526 U.S. at 652. And it warned against mischaracterizing its decision in ways that would "impose more sweeping liability." *Id.* Yet that is exactly what the majority does. Its strained interpretation—that a student need only be left vulnerable to the possibility of further harassment—provides no limit at all. When a school is deliberately indifferent to severe, pervasive, and objectively offensive harassment in its programs and activities, students are always left vulnerable to further harassment. If that was all the Court intended, it would not have imposed the additional requirement that the school's deliberate indifference must also *subject* students to harassment. The majority has thus effectively erased one of *Davis*'s "very real limitations" on liability. *Id.*

The majority's decision cannot be reconciled with the cautious approach the Court took in *Davis*. That caution reflects, in part, a concern regarding adequate notice. See *id.* at 640–41, 644–45. Schools are only liable under Title IX as a condition of receiving federal funds, "much in the nature of a contract." *Id.* at 639–40 (quotation omitted). Title IX liability therefore rests on whether a school "voluntarily and knowingly accepts the terms of the 'contract,'" which it cannot do if it is "unable to ascertain what is expected of it." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). To ensure that schools can "exercise their choice knowingly, cognizant of the consequences of their participation," the scope of their potential liability under Title IX must be "unambiguous[]." *Id.* If nothing else, no one could say the sweeping liability the majority permits today arises unambiguously from the text of Title IX or *Davis*.

III

The facts in the record are insufficient to establish any of the three elements necessary to make out a claim under *Davis*. A single instance of off-campus sexual assault does not constitute actionable harassment. Regardless, the University comprehensively and immediately responded to it anyway. When the University learned of new evidence that undermined its findings after Cephus's acquittal, it reduced his punishment from expulsion to suspension. Although it vacated its earlier sexual assault finding, the University still required Cephus to avoid all contact with Arana. And after he returned to campus, Arana never saw him again. No reasonable juror could find the University's response deliberately indifferent. Even if one could, the University still isn't liable in the absence of further acts of harassment. In holding otherwise, the majority establishes a new Title IX standard that is irreconcilable with *Davis* and practically limitless in scope. I respectfully dissent and encourage the full court to act swiftly to bring our circuit back into alignment with *Davis*.